**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Virginia HURST (90–6235); Sam T. Burnett (90–6448); and Eddie E. Shutt (90–6254), Defendants–Appellants.**

**Nos. 90–6235, 90–6448 and 90–6254.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 9, 1991.

Decided Dec. 13, 1991.

Joe B. Brown, U.S. Atty., Hal McDonough, Asst. U.S. Atty. (argued), Robert Washko, Asst. U.S. Atty. (briefed), Office of U.S. Atty., Nashville, Tenn., for U.S.

Robert W. Ritchie (argued), Ritchie, Fels & Dillard, Wayne A. Ritchie, II (briefed), Knoxville, Tenn., for Virginia Hurst.

Bob Lynch, Jr. (argued & briefed), Nashville, Tenn., for Sam Thomas Burnett.

Aaron Wyckoff (argued & briefed), Nashville, Tenn., for Eddie E. Shutt.

Before RYAN and NORRIS, Circuit Judges, and DUGGAN, District Judge.*

RYAN, Circuit Judge.

Defendants Virginia Hurst, Sam T. Burnett, and Eddie E. Shutt appeal their convictions for engaging in an illegal gambling business under the laws of the State of Tennessee, in violation of 18 U.S.C. § 1955, and conspiracy, 18 U.S.C. § 371. Burnett also appeals his conviction on seven counts of mail fraud, in violation of 18 U.S.C. § 1341.

## I.

This case arises from the operation of an illegal commercial, "storefront" bingo hall. The indictment alleged that defendants Hurst, Burnett, and Shutt, along with government witness James V. Long, conspired to conduct an illegal gambling business in violation of the laws of the State of Tennessee by acquiring and controlling the

* The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

charter of a 26 U.S.C. § 501(c) tax-exempt organization, fraudulently filing documents with the State of Tennessee in order to gain a bingo permit, and personally profiting from the operation of an ostensibly nonprofit, charitable bingo game. The charges specifically referred to the defendants' actions in conducting bingo games under the auspices of the Columbia Scholarship Fund, Inc. (CSF) between September 1986 and January 1987.

Bingo, because it is a form of gambling, is illegal in Tennessee. During the time periods relevant to this case, however, bingo operations conducted by certain tax-exempt religious or charitable organizations were exempted by statute from the gambling laws. The statute provided that state-licensed bingo games were to be regulated and supervised by the Charitable Solicitations Division of the Tennessee Secretary of State. This charitable bingo exemption was declared unconstitutional by the Tennessee Supreme Court in 1989, and thereafter repealed by the Tennessee Legislature.

Long, the government witness, was a neighbor and friend of W.D. (Donnie) Walker, the Tennessee Secretary of State's chief compliance officer in the Charitable Solicitations Division. Anticipating, correctly, that his friendship with Walker would prove beneficial, Long decided to form a loosely organized association of illegal storefront bingo operators and to serve as a lobbyist for the association. The scheme Long and the bingo operators used to avoid prosecution was to obtain the charter of a section 501(c) tax-exempt organization in order to operate the games under its auspices as a tax-exempt charitable or religious organization. Virginia Hurst operated several such bingo games in Knoxville, Tennessee, and was a member of Long's association, contributing dues as well as providing Long with money for the purpose of paying off Walker.

As part of his services, Long would, upon the request of a prospective illegal bingo operator, locate an inactive, nonprofit organization with section 501(c) tax-exempt status. With Long's assistance, false documents would be filed to reactivate the organization's charter for the ostensible purpose of obtaining a permit to conduct a state-licensed charitable bingo.

The origins of the CSF charter date back to 1975 when Shutt, along with six others, formed a nonprofit organization known as the Columbia Military Academy Alumni Association. Following the closing of the academy in 1979, the association held no meetings and filed no annual corporate reports with the Tennessee Secretary of State. In March 1983, the Secretary of State's Office revoked the Columbia Military Academy Alumni Association's charter due to its failure to file annual reports.

In October 1984, Shutt, listing himself as president of the association, sought to reactivate the association for the purposes of obtaining a bingo permit. He filed amendments to the organization charter changing its name to the Columbia Scholarship Fund, Inc. and its address to his residence. In early 1985, Shutt sought Long's assistance in establishing a bingo hall in Columbia, Tennessee. Long felt that Columbia would not be a good spot for bingo and, having already spoken with Hurst about opening a bingo hall in the Crossville, Tennessee area, persuaded Shutt to set up the CSF bingo game there. It was agreed that Shutt would "lease" the CSF charter for $800–$1000 to Hurst and Long for the operation of the CSF–Crossville bingo game.

Also early in 1985, Burnett, who was serving as a Tennessee state legislator, approached Long to express an interest in becoming involved in bingo. Long informed Burnett that he intended to open a bingo hall in Crossville and had already located an operator to conduct the game. Burnett, an attorney, told Long that he was representing an individual from Florida who might be interested in investing in bingo. Hurst, Burnett, and Long later met and decided that Hurst would receive 40% of the profits for setting up and running the bingo hall, Burnett and his investor would provide half of the capital necessary and would receive 40% of the profits, and Long would provide the remaining half of the capital for a 20% return. Long testi-

fied that he agreed to the lesser percentage because he felt it advantageous to include state legislator Burnett.

Burnett thereafter contacted his "Florida" investor, Joseph Cappello, advising him of the amount of capital that would be necessary to become involved as a partner in the Crossville bingo hall. Joseph Cappello was in prison at the time and, therefore, instructed his wife, Caprita Cappello, to send the money to Burnett. Caprita Cappello, although with some hesitation, eventually issued a series of six checks to Burnett totalling $48,000. Each of these checks was the basis for one of the mail fraud counts against Burnett.

After some effort during January 1986, Hurst located a suitable building for the bingo hall in Crossville. Hurst signed the lease agreement for the building. By this time, Shutt had already filed articles of amendment to the CSF charter and changed the organization's address. In February 1986, Hurst induced her associate, Wilbur Lee Riggs, to open a bank account in Crossville in the name of CSF. Dorothy Varnell, another of Hurst's associates, listed herself as chief executive officer of CSF and filed an application with the state of Tennessee for a permit to conduct bingo under the auspices of the organization. Varnell testified at trial that she had never been a member of CSF, nor had she ever been a resident of Crossville, Tennessee, as the application stated. On instructions from Hurst and Long, Varnell also signed numerous applications which falsely stated that the individuals named therein were members of CSF so that they might also conduct bingo at the Crossville location.

Acting upon these falsified documents, the Tennessee Secretary of State's Office approved CSF's application on September 19, 1986 for a permit to conduct bingo. The defendants started conducting a bingo game in the name of CSF soon after receiving this permit. In the following months, the defendants and other co-conspirators prepared additional false statements certifying that workers in the CSF bingo game were members of the organization in good

standing and had been members for a period of at least one year. The CSF bingo hall, however, was not as successful as hoped, and the operation was terminated in January 1987.

Meanwhile, Joseph Cappello was becoming anxious to reap the rewards of his investment in the CSF bingo operation. The six checks issued by Caprita Cappello had been received by Burnett and deposited into his attorney-at-law trust account, except for one check, #9977, in the amount of $10,000. Check #9977 was given by Burnett to Long who gave it in turn to Hurst. Hurst then instructed Riggs to deposit the check into the CSF bank account which Riggs had previously opened. Burnett also wrote a check from his trust account payable to CSF in the amount of $5,000. The rest of the Cappellos' money in the trust account was used by Burnett for his own personal expenses. As one example, the government presented evidence showing that Burnett used the Cappellos' money to pay his own real estate taxes.

When Joseph Cappello asked Burnett how things were going, Burnett assured him that everything was fine and, in November 1986, even provided Joseph Cappello with a bank signature card in order to open an account for the returns on his investment. The CSF bingo game was not profitable, however, and Burnett never opened any account for the Cappellos. Having failed to receive a satisfactory accounting from Burnett, Joseph Cappello sought the services of an attorney. The Cappellos' attorney attempted to meet with Burnett and requested several times that Burnett return the Cappellos' money. Burnett instead mailed false invoices to the Cappellos' attorney, seeking to conceal his use of approximately $33,000 of the Cappellos' money for his own personal expenses. The false invoices were provided to Burnett by Long, who also ran a bingo supply company, and reflected fictitious sales of various bingo supplies by Long's company to the CSF bingo game totalling $39,691.79. The mailing of the false invoices formed the basis of the final mail fraud count against Burnett.

## II.

### A.

### "Violation of the Law of a State" under 18 U.S.C. § 1955

Congress enacted 18 U.S.C. § 1955 as part of the Organized Crime Control Act of 1970. The statute provides, in pertinent part:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

18 U.S.C. § 1955.

 All three defendants appeal their convictions under section 1955 on the grounds that the State of Tennessee legalized the game of bingo under Tenn.Code Ann. § 39–6–609 and that the indictment, therefore, failed to state a violation of the laws of a state as required under section 1955(b)(1). These contentions rely primarily on statements of the Tennessee Supreme Court in *Secretary of State v. St. Augustine Church,* 766 S.W.2d 499 (Tenn.1989). Specifically, the defendants claim that *St. Augustine Church* stands for the proposition that bingo was a legalized form of gambling in Tennessee during the times relevant to the activities in this case.

Their reliance, however, is misplaced. Nowhere in *St. Augustine Church* did the Tennessee Supreme Court declare that bingo, per se, was a legal form of gambling in Tennessee. Nor did the Tennessee Legislature, in exempting certain qualified charitable bingo operations under section 39–6–609, ever exempt the game of bingo from its general prohibitions on gambling under Tenn.Code Ann. § 39–6–607 and 39–6–608.

Under Tennessee law, "bingo" and "gambling" were defined as follows:

(1). "Bingo" shall mean a game of chance in which players place markers on a pattern of numbered squares, according to numbers drawn and announced by a caller.

. . . .

(3). "Gambling" means risking any money, credit, deposit, or other thing of value for gain contingent in whole or part upon lot, chance or the operation of a gambling device, but does not include: bona fide contests of skill, speed, strength or endurance in which awards are made only to entrants or the owners of entries; bona fide business transactions which are valid under the law of contracts; and other acts or transactions expressly authorized by law;

Tenn.Code Ann. § 39–6–601 (repealed 1989). Thus, bingo, as a game of chance, was a form of gambling unless "expressly authorized by law." According to sections 39–6–607 and 608, one who engaged in gambling or professional gambling was guilty of either a misdemeanor or felony under Tennessee law.

An exemption to the general prohibition on gambling was carved out in section 39–6–609, which provided, in pertinent part:

**Exceptions for tax exempt organizations—Regulation of bingo games.—** (a)(1) Sections 39–6–601—39–6–641 shall not apply to any bingo game, raffle, or similar game of chance conducted by a religious or charitable organization exempt from taxation pursuant to paragraph (3) of subsection (c) of § 501 of the Internal Revenue Code of 1954, as amended. . . .

(2) Provided further, this exemption applies only if no part of the receipts from such activity enures to the benefit of any private shareholder, member, or employee of such organization; and only if all proceeds, after necessary and rea-

sonable costs, be used for charitable or religious purposes, including educational and youth programs and constructing or maintaining a building to be occupied by the exempt organization; or for any legal purpose for which the organization was established. Provided further, the total of such necessary and reasonable cost, including constructing or maintaining a building to be used by the organization, salaries, and other expenses of conducting the activities permitted pursuant to the exemption provided in this subsection, shall not exceed twenty-five percent (25%) of the gross receipts derived from such activities. . . .

. . . .

(4) The exception granted by this section to a religious or charitable organization exempt from taxation pursuant to paragraph (3) of subsection (c) of Section 501 of the Internal Revenue Code of 1954, as amended, shall only apply if the receipts of the activity are expended for a charitable or religious purpose within the state of Tennessee or are expended in an adjacent state when the funds provide a direct service or benefit to a Tennessee resident.

(b) The conduct of bingo games shall be strictly according to the following requirements:

. . . .

(2) Bingo games and raffles may be conducted only at the place of the organization's domicile and after the organization has been in existence for a period of not less than five (5) years during all of which time it shall have carried on the principal activity authorized by its corporate charter. . . .

(3) The organization shall under no circumstances commingle its bingo proceeds with its general funds, but shall maintain a separate segregated account for its bingo operation, into which no other moneys shall be deposited.

. . . .

(7) No person may conduct bingo on behalf of an organization who has not been a member thereof in good standing for not less than one year and a bona

fide resident of the state and county for not less than six (6) months prior to the commencement by the organization to conduct bingo; and no member of an exempt organization shall receive compensation for conducting or assisting in the conduct of bingo.

Tenn.Code Ann. § 39–6–609 (repealed 1989).

While defendants claim to have operated an ostensibly legitimate bingo hall under the section 39–6–609 exemption, their failure to comply with the prerequisite conditions and the strict regulations for operating bingo games under the statutory exemption placed their operation squarely in violation of the Tennessee gambling laws. Nonprofit, charitable bingo operations by qualified organizations were exempted from the general gambling prohibitions in Tennessee. Storefront bingo games for the personal profit of the operators were not. The claim that bingo, as conducted by defendants, was a legal form of gambling in Tennessee must fail.

Defendants next argue that the government's use of the Tennessee exemption statute, section 39–6–609, in framing the indictment and later the jury charge, was error.

Specifically, defendants argue that while section 39–6–609(a) sets forth qualifications for legitimate bingo games and a violation of its provisions might provide for criminal. gambling penalties, section 39–6–609(b) sets forth administrative regulations for the licensing of qualified bingo games and could in no way be construed as a criminal prohibition. Therefore, the argument continues, by using regulations from section 39–6–609(b) in the jury charge, the court invited the jury to convict defendants for violations of state law which were unrelated to whether the bingo game in question was illegal. For example, defendants state that Tennessee bingo operators such as themselves could be convicted under federal criminal laws for having used a billboard larger than twelve feet in diameter, in violation of section 39–6–609(b)(8)(A), or for advertising in a local newspaper twice

in one month, in violation of section 39–6–609(b)(8)(B).[1]

The litany of horrors posited by the defendants, however, has only marginal relevance to this case. The only possible regulation at issue is section 39–6–609(b)(7)(A), which required that a person conducting bingo must have been a member of the charitable organization for a period of one year and a resident of the state, county, or contiguous county for a period of six months. Defendants point to credibility problems with Long, the principal government witness, and to testimony from several others that they worked in the CSF bingo operation despite their not being members in good standing of the organization for one year, to argue that the jury likely rejected Long's extensive testimony as to the sham organization and the personal profit of the operators, and instead relied on the testimony of a few workers as to minor infractions in order to establish a violation of the gambling laws of Tennessee.

This result appears most unlikely on the record. The matter of the residence and membership of bingo workers went directly to the charge that CSF was not a real charity but rather was a cover for an illegal storefront bingo operation. The evidence did, in fact, state a major violation of the Tennessee gambling laws. Despite defendants' arguments that the jury might have convicted them for a trivial violation such as having a thirteen-foot billboard, they can point to no portion of the indictment or jury charge which would have permitted such a result. Neither the evidence presented nor the jury charge support this contention.

Finally, defendants ask the court to recognize a distinction between civil/regulatory and criminal/prohibitory laws as the Court of Appeals for the Ninth Circuit did in *United States v. Farris*, 624 F.2d 890 (9th Cir.1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 919, 66 L.Ed.2d 839 (1981). *See also Cabazon Band v. County of Riverside*, 783 F.2d 900 (9th Cir.1986), *aff'd sub nom., California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); and *Barona Group of the Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir. 1982), *cert. denied*, 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983). In those cases, the Ninth Circuit was called upon to decide whether section 1955 was violated by an Indian tribe that conducted bingo games on an Indian reservation in a way that violated the provisions of state law. In *Farris*, the court held that because the public policy of the State of Washington prohibited large-scale gambling businesses of the type being operated by defendants on Indian trust land in the state, section 1955 applied. *Id.* at 893–896. According to the Ninth Circuit, the test is whether the tribal activities, conducted in violation of some of the terms of the state law, are violative of the public policy of the state. *Farris*, 624 F.2d at 895. In *Cabazon* and *Barona*, the court held that because the California bingo laws were merely civil/regulatory in nature, they could not serve as a predicate for a section 1955 violation. "[B]ingo games are not contrary to the public policy of California, [hence] the activity is not violative of [section 1955]." *Cabazon*, 783 F.2d at 903. The defendants ask us to hold that, based on the Ninth Circuit's reasoning, the Tennessee laws which permitted some limited bingo were like the California statute, merely civil/regulatory and therefore not a valid predicate for a section 1955 prosecution.

The short answer to the defendants' contention is that this court has rejected the civil/regulatory test in section 1955 prosecutions in *United States v. Dakota*, 796 F.2d 186 (6th Cir.1986). The court observed that the Ninth Circuit analysis was developed in the context of civil litigation

---

1. Sections 39–6–609(b)(8)(A) and (B) provided:

 (8) Advertising for bingo games and raffles conducted under this section shall be limited to:

 (A) A sign on the premises of not more than twelve (12) feet in diameter;

 (B) No more than one paid advertisement per month in a local newspaper and such advertisement may not exceed six (6) inches by four (4) columns....

 Tenn.Code Ann. § 39–6–609(b)(8)(A)–(B) (repealed 1989).

primarily concerned with the interpretation of Public Law 280 that governs the enforcement of state statutes on federal Indian reservations. The *Dakota* court stated that "the criminal/prohibitory-civil/regulatory test is inappropriate to an interpretation of 18 U.S.C. § 1955" in a declaratory judgment action seeking to enjoin bingo games being conducted on an Indian reservation, in violation of a Michigan statute. *Id.* at 187–88. The question, the *Dakota* court said, was whether the gambling activities on the Indian reservation amounted to a "violation of the law" of the State of Michigan. *Id.* at 188–89. The court refused to determine that question by employing a criminal/prohibitory-civil/regulatory test, declaring:

> Finally, we note the criminal/prohibitory-civil/regulatory test requires courts to make arbitrary classifications of state laws. As states frequently pass laws that to some extent both regulate and prohibit a given activity, the test is difficult to apply. This difficulty further supports our conclusion that the criminal/prohibitory-civil/regulatory test should not be extended outside of the context [of the interpretation of Pub.L. No. 280].

*Id.* at 189. This, of course, is not a declaratory judgment action against an Indian tribe. Nevertheless, the reasoning of this court in *Dakota* in rejecting the criminal/prohibitory-civil/regulatory test is equally applicable here. Storefront, for-profit bingo operations of the type charged in this case are clearly contrary to Tennessee public policy and the evidence demonstrates that the defendants flagrantly violated Tennessee criminal laws prohibiting gambling. The Tennessee laws at issue here were clear: bingo was illegal, absent an operator's narrowly circumscribed status as a qualified charitable organization conducting games in strict adherence to the rigid conditions set forth for nonprofit bingo games. Equally clear is the evidence that defendants violated these qualifying and operational conditions. The false documentation establishing CSF as a charitable organization in this case, and the operation of a commercial, for-profit bingo hall under

the organization's auspices, were manifest violations of the criminal laws of the State of Tennessee. For these reasons, the defendants' argument that the criminal laws of Tennessee were not violated must be rejected.

### B.

### Constitutionality of Section 36–6–609 under the Tennessee State Constitution

■ Defendants argue that the Tennessee Supreme Court's ruling in *St. Augustine Church*, 766 S.W.2d 499, declaring the exemption statute, section 39–6–609, unconstitutional because the game of bingo was a prohibited "lottery" under the Tennessee Constitution, made that law void *ab initio* and voids subsequent prosecutions using that law to establish the "violation of the law of a State" element of section 1955.

As we have stated, the government did not depend on the violation of section 39–6–609 to establish a violation of the laws of Tennessee, but instead relied upon violations of the state's general gambling prohibitions in sections 39–6–607 and 39–6–608. Any evidence establishing violations of the provisions of section 39–6–609 was not necessary. It was no more than an additional burden the prosecution assumed in order to clarify and explain defendants' acts in operating and promoting a sham charitable organization and bingo hall.

Furthermore, regardless of whether the Tennessee Legislature's attempt to legalize bingo was lawful under the Tennessee Constitution, it is nevertheless true that bingo, if it failed to meet the prerequisite conditions set forth in section 39–6–609, was unlawful during all relevant periods of time. The fact that the exemption law was ultimately determined to be beyond the power of the Tennessee Legislature does not void the federal government's reliance upon that law to establish that defendants' bingo operations were contrary to the laws of the State of Tennessee. The game of bingo was illegal in Tennessee, except if conducted by a qualified charitable organization and according to strict regulations.

The unconstitutionality of section 39–6–609, an exemption law, did not prohibit this prosecution any more than it made properly licensed and conducted charitable bingo games illegal during the relevant time. Defendants misused the exemption law for charitable organizations in order to make their illegal bingo operation appear legitimate. They cannot now complain of the unconstitutionality of that exemption.

### C.

#### Entrapment by Estoppel Instruction

■ Defendants argue that the district court erred in failing to instruct the jury as requested on the defense of entrapment by estoppel. A conviction cannot stand under the Due Process Clause where a citizen exercises a privilege or engages in conduct after a state official tells the defendant that the particular conduct is legal and the defendant believes the official. In *Cox v. Louisiana*, 379 U.S. 559, 571, 85 S.Ct. 476, 484, 13 L.Ed.2d 487 (1965), the Court held that express and affirmative statements by police officials granting defendants permission to picket across the street from a courthouse required reversal of convictions for demonstrating "near" a courthouse. Similarly, in *Raley v. Ohio*, 360 U.S. 423, 438, 79 S.Ct. 1257, 1266, 3 L.Ed.2d 1344 (1959), convictions for contempt for failing to answer questions before a state commission were reversed where officials mistakenly instructed defendants of their right to exercise their privilege against self-incrimination contrary to a state law depriving them of the privilege.

Defendant Hurst contends that the requested entrapment by estoppel instruction was warranted by testimony that she relied on the actions of compliance personnel of the Tennessee Secretary of State's Office who were aware that the same people were working for her at bingo games for two different charitable organizations yet took no action regarding these apparent violations. Defendant Shutt relies on statements that he testified were made to him by David Collins, an acquaintance and attorney in the Secretary of State's Office, and Donnie Walker, chief compliance offi-

cer in the Secretary of State's Charitable Solicitations Division. Collins, who had authority in the area of elections, not bingo laws, apparently told Shutt that he could raise money for the Columbia Military Academy by starting a bingo hall. Walker, in response to questions from Shutt regarding the use of a charitable charter for the purpose of playing bingo, did not indicate that there was anything wrong with Shutt's receiving $800 for the use of the CSF charter and allegedly suggested that Shutt "make up" minutes of meetings required to show that the organization was genuine. Defendant Burnett also appears to rely on those same statements by Donnie Walker as the basis of an entrapment defense.

■ A defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in the defendant's favor. *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). In this case, however, there is simply no evidence that the defendants were ever told by state officials that their actions were legal. Walker instructed Shutt on how to flout the law, not how to abide by it, and statements by Collins contained no indication that falsified documentation and personal profits were legal under Tennessee bingo laws. Similarly, compliance officers did not tell Hurst that employing nonmembers to work bingo halls in multiple locations was legal. Instead, they simply failed to enforce the law. If this court were to accept Hurst's contention that mere nonfeasance in law enforcement was tantamount to official approval of illegal acts and entrapment, there would be scarcely a speeding ticket not subject to due process challenge.

Moreover, the statements allegedly relied upon were made by state officials relating to state law, while the defendants were charged with violations of federal law. One of the purposes of section 1955 was to aid in the enforcement of state gambling laws where state enforcement was disabled by corruption of state officials. *Farris*, 624 F.2d at 892. Allowing a state official's

alleged complicity in illegal activities to void the convictions here would violate the intent of Congress in enacting section 1955 and distort the clear due process doctrine set forth in *Cox* and *Raley.*

### D.

### Specific Conduct Evidence

■ Defendant Shutt appeals the trial court's ruling permitting inquiry upon cross-examination concerning the details of his prior conviction. Shutt pleaded guilty in 1983 to charges of attempting to obstruct justice. The conviction stemmed from a prosecution for bank robbery in which Shutt offered a bribe to a police chief in an attempt to have the officer file a false document creating an alibi for the defendant. On direct examination, Shutt's attorney elicited from him the fact that he had been previously convicted of attempted obstruction of justice. On cross-examination, the government sought to question Shutt as to some of the specifics of the crime. Relying on *United States v. Rosa,* 891 F.2d 1063, 1069 (3d Cir.1989), where the court wrote that "[b]ribery ... is not the kind of conduct which bears on truthfulness or untruthfulness," Shutt contends that his actions were not the kind bearing on truthfulness or untruthfulness and, since the prior conviction was acknowledged by Shutt on direct examination, the government was not allowed to revisit the issue or to inquire as to details of the crime.

The trial court, after hearing arguments outside the presence of the jury, overruled Shutt's objection, holding that Shutt's credibility was at issue and that the specific conduct of attempting to bribe a police officer was relevant to his truthfulness or untruthfulness. The ruling was based upon Fed.R.Evid. 608(b) which permits inquiry on cross-examination into specific instances of conduct bearing on the credibility of a witness if probative of truthfulness or untruthfulness.

The government's questioning proceeded as follows:

Q. Mr. Shutt, Mr. Wyckoff asked you why you pleaded guilty of [sic] the charge of obstruction of justice and you answered because you were guilty, is that correct?

A. Yes sir.

Q. And at that time in 1982, sir, you were charged in the Western District of Tennessee, were you not, with attempting to obstruct justice by offering Jerry Wyatt, chief of police in Brownsville, Tennessee, a payment of up to $10,000 to Jerry Wyatt if Jerry Wyatt would place a false document in the Brownsville Police Department records showing that David Eugene Graham had been in the Haywood County, Tennessee area on August the 7th of 1979 between nine o'clock and nine-twenty a.m. The purpose of that false document was to create an alibi for David Eugene Graham who was to go on trial two days later on September the 8th of 1982 in the United States District Court in the Eastern District of Tennessee, that is in Chattanooga, in which David Graham had been charged with bank robbery which had occurred on August the 7th, 1979. And that was the basis for your obstruction of justice charge, wasn't it, sir?

Immediately after defendant Shutt affirmed the correctness of the allegation contained in the indictment, the court instructed the jury as follows:

Now, ladies and gentlemen, you'll consider this evidence that you've just heard concerning the facts related to Mr. Shutt's prior conviction solely as it bears on the issue of his credibility which is for you to judge, that is his truthfulness or untruthfulness, and it's for that limited purpose solely that you are to consider this testimony. As I say, as it bears on his—the issue of his credibility.

You're not to consider this evidence for the purpose of any propensity, having committed one crime that he would commit another; that is you're not to decide this case on some kind of bad man theory. You clearly understand that. This testimony solely and only goes to the issue of his truthfulness or untruthfulness, that is his question of credibility. You clearly understand that.

▮ Whether a specific conduct is probative of the truth and honesty of a witness under Rule 608(b) is a matter within the discretion of the trial court. *United States v. Vinson*, 606 F.2d 149, 156 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), *reh'g denied*, 445 U.S. 972, 100 S.Ct. 1668, 64 L.Ed.2d 251 (1980). Where the accused has disclosed a prior conviction, it is not necessarily prejudicial to allow cross-examination developing its circumstances. *United States v. Graham*, 325 F.2d 922, 927 (6th Cir.1963). In this day in which most guilty pleas are products of plea bargaining, and usually charge bargaining, the statutory name of the offense to which a defendant pleads guilty is rarely informative, and often misinformative, about the nature of the offense to which guilt is acknowledged as the plea allocation. It is often appropriate, indeed necessary, if the fact finder is to be able to evaluate the significance of the prior conviction to the witness' credibility, that some details of the truthfulness-related offense be described. In this case, the trial court did not abuse its discretion in determining that the specific conduct resulting in Shutt's prior conviction was a relevant consideration as to his veracity or in allowing the prosecution to question Shutt briefly in order to explain the nature of the conviction. The conduct was not merely bribery, as Shutt argues, but subornation of perjury. It was well within the discretion of the trial court to conclude that the conduct was probative of the truthfulness or untruthfulness of the witness. To the extent that the Third Circuit's opinion in *Rosa*, 891 F.2d at 1069, might be read to suggest that bribery-related offenses are not probative of a witness' truthfulness or untruthfulness in all cases, we disagree.

Further, the scope of cross-examination was narrow and brief. The government did not badger the witness, nor did it exhaustively comb the subject. A cautionary instruction was also issued to the jury immediately following this questioning. Thus, not only did the trial court act within its discretion, but Shutt fails to make an adequate showing of prejudice.

## E.

### Variance Between Indictment and Evidence

Defendant Burnett contends that a fatal variance exists between the terms of the indictment and the evidence at trial on the six counts of mail fraud related to the series of checks received from Caprita Cappello. Burnett argues that there was no evidence of his having directly informed Caprita Cappello of the "investment opportunity" and that it was she, not Joseph Cappello, who wrote the checks. Thus, Burnett claims that because he was charged with having defrauded Joseph Cappello, although the evidence showed that it was Cappello's wife who provided the money, Burnett was convicted of a crime different than the one charged in the indictment and is still subject to another prosecution for defrauding Caprita Cappello.

▮ Not every variation between the indictment and the proof is unfair. A fatal variance occurs only where there has been such a variance as to " 'affect the substantial rights' " of the accused. *United States v. Zelinka*, 862 F.2d 92, 96 (6th Cir.1988) (quoting *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935)). Substantial rights are affected only when a defendant shows " 'prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions.' " *Id.* at 97 (quoting *United States v. Miller*, 471 U.S. 130, 138 n. 5, 105 S.Ct. 1811, 1816 n. 5, 85 L.Ed.2d 99 (1985)).

▮ The alleged variance in this case, if one exists, is certainly not fatal. The indictment clearly set forth a charge that Burnett defrauded both Joseph and Caprita Cappello by investing "their monies." The fact that the checks were written from an account that Caprita Cappello testified was her separate property did not affect Burnett's ability to defend himself against the charge of scheming to defraud the couple, nor does it open Burnett up to new charges with respect to Caprita Cappello. Burnett dealt with Joseph and Caprita Cappello as a

couple, sending letters explaining the investment plans to Caprita's Florida address. Burnett's scheme was addressed to both Joseph and Caprita Cappello, and the indictment charged him with such an offense. There was no fatal variance between the crime charged and the evidence presented.

### F.

### Prosecutorial Misconduct

Two arguments are raised by defendants with respect to the government's closing arguments. First, defendants Burnett and Shutt argue that the prosecution improperly vouched for the credibility of the principal government witness, James Long. Second, defendant Shutt argues that a mistaken statement of fact by the prosecution denied him a fair trial and mandates reversal of his conviction. We address the vouching issue first.

■ Following repeated arguments by counsel for the defendants that Long had lied and told the government what it wanted to hear, and statements by Burnett's counsel that the government prosecutors "don't represent the United States" and implying vindictive prosecution, the prosecutor stated, in closing arguments:

> Mr. Long testified before you that he is a convicted felon in his own right. No doubt about it, he has paid those penalties of conviction and his penalties and sentencing are just yet to come.
>
> Now, the defense has made much to-do about what his motivations are of coming before you and testifying. Let me tell you that the Government has done as much as we can do to insure his credibility as a witness. First of all, myself, Mr. McDonough, Mr. Knudsen, we do in fact represent the United States of America. As representatives of the United States, I have an obligation, Mr. McDonough has an obligation and Mr. Knudsen has an obligation not to bring to you perjured testimony, and our obligation, particularly Mr. McDonough and myself as prosecutors are equally to protect the innocent

as much as prosecute and bring to task those individuals—.

At that point, defense counsel objected. The trial court instructed the jury that it was improper for an attorney to vouch for a witness' credibility, though it found that "nothing had been said that would justify vouching."

■ A government attorney has a duty not to express a personal opinion or belief regarding the truth or falsity of any testimony or evidence. *United States v. Young,* 470 U.S. 1, 8, 105 S.Ct. 1038, 1042, 84 L.Ed.2d 1 (1985). We agree with the trial court, however, that there was no vouching by the prosecution in this case. In response to attacks on the credibility of the government's main witness, the prosecutor sought to explain his efforts to ensure full and honest disclosure by Long. The statements did not constitute an expression of personal belief or opinion concerning Long's veracity.

■ The second allegation of prosecutorial misconduct is raised by defendant Shutt alone. In response to repeated statements by Shutt's counsel that Shutt was not present when the conspirators were arranging to split the proceeds and planning the sham operation, the prosecutor, in closing arguments, stated:

> Now, with respect, first of all, off with Mr. Shutt, Mr. Wyckoff, to take them in reverse order, Mr. Wyckoff started off with Shutt, that's where this whole nefarious criminal activity starts. Mr. Wyckoff made a lot of mention of the fact that Mr. Shutt wasn't there in Memphis when James V. Long was getting involved with William McBee, with Tom Powell, with others in the Holy Family Miracle Temple, making and getting himself involved in conspiracy and conviction in that district.
>
> No, ladies and gentlemen, he sure wasn't, he was in federal prison with Thomas Burnett in Montgomery, Alabama at Maxwell Air Force Base—.

At which point defense counsel again objected.

Shutt contends that this misstatement denied him a fair trial. It was initially

argued that the statement was irrelevant and, in all events, "not in the record." Later, when it was determined that Shutt was not in prison at the time he claimed, it was asserted that the prosecution had intentionally misstated the facts. After listening to the prosecution's argument, the trial court found no basis for concluding that the prosecution made an intentional misstatement, and the jury was instructed to disregard the statements and that the government "had been mistaken." Shutt repeats these claims on appeal, arguing that the misstatements were intentional and prejudicial.

■ There is no reason to reverse Shutt's conviction in this case. While the government contends that the mistaken statements were invited responses to the arguments of the defense counsel, we need not embark upon a discussion of the doctrine of invited error, for there simply appears no evidence that Shutt was denied a fair trial by these statements. In order to deny a defendant the right to a fair trial, prosecutorial misconduct must be " 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' " *United States v. Thomas,* 728 F.2d 313, 310 (6th Cir.1984) (quoting *United States v. Lichenstein,* 610 F.2d 1272, 1281 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980)), or " 'so gross as probably to prejudice the defendant,' " *United States v. Ashworth,* 836 F.2d 260, 267 (6th Cir.1988) (quoting *United States v. Flake,* 746 F.2d 535, 542 (9th Cir.1984), *cert. denied,* 469 U.S. 1225, 105 S.Ct. 1220, 84 L.Ed.2d 360 (1985)). The statement at issue here was accidental and isolated; it was not pronounced, persistent, or intentional. Moreover, the statement was immediately followed by two cautionary instructions to the jury. There was no unfair prejudice to defendant Shutt.

## G.

### Remaining Issues

■ The remaining issues raised on appeal need not detain us long. First, defendant Burnett argues that the failure of the trial judge to recuse himself from this case denied Burnett a fair trial and constitutes reversible error. As a private attorney years earlier, the trial judge filed a lawsuit against Burnett on behalf of a group of investors alleging fraud. Burnett moved for recusal. The court denied the motion and this court denied Burnett's petition for a writ of mandamus on May 9, 1990. The standard for recusal under 28 U.S.C. § 455(a) is "whether [a] reasonable person, knowing all of the surrounding circumstances, would consider the judge to be impartial." *United States v. Norton,* 700 F.2d 1072, 1076 (6th Cir.), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1885, 76 L.Ed.2d 814 (1983). We are satisfied that a reasonable person would consider the trial judge to be impartial in this matter and find no prejudice toward defendant Burnett.

■ Next, defendant Hurst argues that the admission of the testimony of witnesses Marshall Cranford, Charles Haston, and Marshal Ledbetter was improper. The witnesses chartered an organization in March 1984 named the Columbia Military Academy Alumni Association, Inc. The virtually identical name of this organization and the one founded by defendant Shutt in 1975 caused some confusion in the Tennessee Secretary of State's Office, especially after Shutt sought to reactivate the old charter in October 1984. The witnesses testified that they did not form the organization in order to conduct a bingo game and never intended to do so. Hurst maintains that the testimony was irrelevant and injected an impermissible "moral tone" regarding gambling into the proceedings. We disagree. The trial court has the discretion to decide relevancy questions. *United States v. Dabish,* 708 F.2d 240, 243 (6th Cir.1983). In this case, while the evidence is of questionable relevance to material issues, we cannot say that the trial court abused its discretion in permitting the witnesses to testify. It is at least arguable that the testimony was probative of the issue of Shutt's intentions in reactivating the Columbia Military Academy Alumni Association for purposes other than promotion of the school and its alumni. Moreover, there is absolutely no showing of prejudice.

Finally, Hurst also appeals the imposition of a $50,000 fine, arguing that the maximum penalty for her convictions for illegal gambling and conspiracy was $30,000 under 18 U.S.C. §§ 371, 1955. However, federal law permits fines of up to $250,000 for felonies committed prior to November 1, 1987 under 18 U.S.C. § 3623(a)(3), *repealed by* Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 212(a)(2), Oct. 12, 1984, 98 Stat.1987 (repeal effective Nov. 1, 1987).

### III.

For the foregoing reasons, the convictions of Virginia Hurst, Sam T. Burnett, and Eddie E. Shutt are AFFIRMED.