**UNITED STATES of America,**

**v.**

**John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron"**

**Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Joseph A. Devita, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites, and William E. Rusin, Defendants.**

Crim. No. 91–178.

United States District Court,
W.D. Pennsylvania.

July 22, 1994.

Frederick W. Thieman, U.S. Atty., James R. Wilson, Asst. U.S. Atty., W.D. Pa., William D. Braun, Criminal Div., U.S. Dept. of Justice, Washington, DC, for plaintiff.

James Wymard, William Difenderfer, Anthony Mariani, Ellen Viakley, Gary Gerson, Caroline M. Roberto, Joel Johnston, Stanley Greenfield, Martha Bailor, Ray Radokovich, Carmen Martucci, Lee Markovitz, Edward J. Osterman, William Acker, Foster Stewart, Joseph Kanfoush, Carl Max Janavitz, Raymond M. Maloney, John Goodrich, Gary B. Zimmerman, Vincent Baginski, John Zagari, James Andring, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court are Defendant Phillip M. "Mike" Ferrell's motions to dismiss: (1) Pretrial Motions Filed on Behalf of Defendant Phillip M. "Mike" Ferrell: Motion To Dismiss on the Basis of Selective Prosecution (Document No. 379, in part); (2) Pretrial Motions Filed on Behalf of Defendant Phillip M. "Mike" Ferrell: Motion to Dismiss on the Grounds That Video Poker Machines Are De Facto Legal in Pennsylvania (Document No. 379, in part); (3) Pretrial Motions Filed on Behalf of Defendant Phillip M. "Mike" Ferrell: Motion to Dismiss on the Ground That the Alleged Gambling Activities are De Minimis (Document No. 379, in part); (4) Pretrial Motions Filed on Behalf of Defendant Phillip M. "Mike" Ferrell: Motion to Dismiss on the Ground that the Alleged Illegal Gambling Activity Was an Exercise of Public Authority (Document No. 379, in part).

Also before the Court are the related motions seeking to assert affirmative defenses: (5) John Francis "Jack" Conley's Omnibus Pretrial Motion: Motion to Assert Good Faith Defense (Document No. 374, in part); (6) Pretrial Motions Filed on Behalf of Defendant Phillip M. "Mike" Ferrell: Motion for Leave to Assert Affirmative Defense (Document No. 379, in part).

*PROCEDURAL BACKGROUND*

Defendant Ferrell filed an omnibus pretrial motion, (Document No. 379), which included his four motions to dismiss and his motion to assert an affirmative defense. On March 2, 1993, the Court held a hearing. At the hearing, Counsel for Defendant Ferrell introduced the testimony of Defendant Curtin. Counsel for Defendant Ferrell attempted to introduce further evidence in support of his motions. The Court sustained the Government's objection to the further evidence, holding that Defendant Ferrell's proffer did not constitute a preliminary showing adequate to warrant further evidentiary proceedings on his motions. The Court, however, indicated that Defendant Ferrell could brief the adequacy of his proffer.

Pursuant to General Order of Court No. 15, these motions were to have been briefed on or before May 14, 1993. No briefs were filed in the appropriate time frame. After the Government indicated that it would address the merits of the motions when Defendant Ferrell filed briefs, rather than rely on procedural default, (Document No. 688), the Court ordered Defendant Ferrell to state his intentions regarding his motions. (Document No. 689). No response was received by the Court. In a subsequent Order of Court, the Court indicated that Defendant Ferrell's motions "have apparently been abandoned." (Document No. 700). Again, Defendant Ferrell did not respond. Subsequent events revealed an irreconcilable dispute between Defendant Ferrell and his counsel, who was later granted leave to withdraw.

Due to the importance that the Defendants place on the issues raised in Defendant Ferrell's motions, Defendants John F. "Duffy" Conley and William C. Curtin moved to adopt Defendant Ferrell's motions to dismiss, in which they had previously moved to join. (Document No. 709). Over the Government's objections, (Document No. 725), the Court granted in part and deferred in part the motion to adopt. (Document No. 730). The Court limited Defendants Duffy Conley and Curtin to the record made by Defendant Ferrell, but allowed them to proffer evidence of their connection to the pre-existing record. The Court deferred ruling on the request to file additional materials, pending its ruling

upon the proffered evidence. (Document No. 730).

Defendant Duffy Conley filed two briefs, including proffers of evidence, and Defendant Curtin moved to join in those briefs. (Document Nos. 348–50). The Government filed a response brief. (Document No. 760).

The subject of these motions arose again at a status conference held by the Court on January 27, 1994. As a result of the status conference the Court issued its Summary Order of Court dated February 3, 1994, (Document No. 821), which reiterated and modified the Court's rulings from the bench at the status conference. Paragraph (4) of the Court's Summary Order of Court granted leave to any Defendant who had originally joined Defendant Ferrell's motions to dismiss to file a brief and a proffer of evidence in support of reopening the record on these motions.

Defendant Duffy Conley supplemented his previous filings, (Document No. 834), and Defendant Goodwin filed his Motion to Reopen the Record. (Document No. 835). The Government responded to these supplemental filings. (Document No. 843).

The record before the Court consists of a Stipulation of Facts with respect to Pretrial Motions of Defendant Phillip M. "Mike" Ferrell, (Document No. 509), Defendant Curtin's testimony and Defendant Ferrell's proffer at the March 2, 1993 hearing, the additional proffer made in the submissions of Defendants Duffy Conley, Curtin, and Goodwin, and the Indictment. Although the stipulated facts are undisputed and the equivalent of found facts, the motions are being adjudicated without a hearing. The relevance of this procedural fact to the light in which the Court must view the facts in deciding the different motions will be discussed with respect to each motion.

Defendants Duffy Conley and Curtin have indicated that three of the motions to dismiss should be treated as one motion: Pretrial Motions Filed on Behalf of Defendant Phillip M. "Mike" Ferrell: Motion to Dismiss on the Grounds That Video Poker Machines Are De Facto Legal in Pennsylvania (Document No. 379, in part); Pretrial Motions Filed on Behalf of Defendant Phillip M. "Mike" Ferrell: Motion to Dismiss on the Ground That the Alleged Gambling Activities are De Minimis (Document No. 379, in part); Pretrial Motions Filed on Behalf of Defendant Phillip M. "Mike" Ferrell: Motion to Dismiss on the Ground that the Alleged Illegal Gambling Activity Was an Exercise of Public Authority (Document No. 379, in part). The issues raised by these motions are therefore reduced to three issues: (1) Whether gambling with video poker machines is *de facto* legal in Pennsylvania; and the related issue of (2) Whether the Defendants are entitled to assert a good faith defense; and (3) Whether the Government exercised impermissible selectivity in prosecuting the Defendants.

## THE RECORD

### Stipulated Facts

The stipulated facts, which cover the period from January 1, 1984 through September 30, 1991, are set forth as follows:

3. During the aforesaid time frame, video poker machines were present in the United States Judicial District known as the Western District of Pennsylvania, including, but not limited to the following counties: Allegheny, Beaver, Washington and Westmoreland.

4. During the aforesaid time span, these video poker machines were found most frequently, but not exclusively, in bars, lounges, taverns, restaurants, coffee shops, social halls or fraternal and veterans' organizations, laundromats and other places visited by members of the public or members of fraternal and veterans' organizations (hereinafter, collectively referred to as the "locations").

5. During the aforesaid time span, the vast majority of cities, boroughs, townships and other municipalities (hereinafter collectively, the "local governments"), imposed an annual fee or charge on all amusement devices, including video poker machines, that were placed in any location within the local government's borders.

6. The annual charge for each video poker machine for which a fee or charge

was required ranged from approximately $100 to $500 in most instances.

7. The authority under which the local governments imposed the fees or charges arose from an ordinance or ordinances enacted by the governing body of each local government.

8. For the purpose of imposing such fees or charges, most of the local governments classify video poker machines as mechanical or video devices, although some local governments impose the fee or charge on the video poker machine as such.

9. To comply with an ordinance imposing such a fee or charge, the person in control of a video poker machine, or of the location in which a video poker machine is placed, normally completes an application for a video or mechanical device license or permit. The local government then collects the requisite fee or charge for each license or permit that is issued.

10. Often, the local government issues a permit or license to evidence that the annual fee or charge has been paid, which permit or license is affixed to the video poker machine itself or is posted in the location where the video poker machine has been placed.

11. During the time frame covered by this Stipulation, some of the defendants, including, but not limited to, Ferrell have paid the aforesaid fees and charges to local governments and have received licenses and permits to be affixed to video poker machines or posted in the locations in which the same has been placed.

12. To the best of the recollection of any agent of the government, no local government situate within the Western District of Pennsylvania has ever been prosecuted as a result of the governmental activities described herein.

Stipulation of Facts with respect to Pretrial Motions of Defendant Phillip M. "Mike" Ferrell, at 2–3 (Document No. 509).

### Proceedings on March 2, 1993

#### (a) Testimony of Defendant William C. Curtin

The relevant portion of Defendant Curtin's testimony at the March 2, 1993 hearing re-lates to the Pennsylvania Association of Video Operators ("PAVO"). PAVO is a now defunct organization that was formed no earlier than the summer of 1989. Defendant Curtin was president of PAVO. Defendant Curtin was active in PAVO's affairs, participating in decisions, scheduling meetings and working with others on their agendas, and conferring with PAVO's attorneys. Through his work with PAVO, he communicated with persons involved in the video poker machine industry throughout Pennsylvania and was familiar with the activities of almost all of the video poker machine owners and locations in the City of Pittsburgh.

On August 16, 1989, at the Sheraton Hotel in Pittsburgh, there was a PAVO meeting. At the meeting, Defendant Curtin gave the welcome and introduction. There were also remarks by PAVO's general counsel, William Difenderfer, and Mr. Phillip Benson from Montana.

Among the purposes to which PAVO adhered were to settle confusion arising from licenses being issued by municipalities, to advocate legalizing video poker machine gambling in Pennsylvania, to hire lobbyists to that end and to garner support for legalizing video poker machine gambling from representatives of other interested constituencies, such as the Pennsylvania Association of Tavern Owners. Further, PAVO encouraged an appeal by the property owner in a case that was adverse to the interests of video poker machine vendors.

PAVO instituted a fund-raising drive to raise money to advocate legalizing video poker machine gambling in Pennsylvania. At the August 16, 1989 meeting, there was discussion of the amounts of revenues that could be generated by video poker machines in Pennsylvania.

#### (b) Testimony of Frank Amity

Frank Amity, a private investigator retained by Defendant Ferrell, testified and attempted to testify regarding the procedures utilized by municipalities in issuing licenses for video poker machines and/or

vending machines in general.[1] When the Government objected to the relevance of the testimony, which related to procedures existing in 1993, Defendant Ferrell proffered that the then existing procedures would be related back to the time covered by the Indictment. On that basis, the Court overruled the Government's relevance objection.

Shortly thereafter, however, the Government again objected to the relevance of the testimony, and the Court sustained the Government's objection. The thrust of the Government's objection was that Mr. Amity had not communicated to municipal officials an intention to engage in illegal gambling activity and, therefore, the municipalities' proceeding with the license applications was irrelevant to the *de facto* legality and "entrapment by estoppel" contentions being advanced by Defendant Ferrell. The Court agreed with the Government. Because not all video poker machines are *per se* illegal in Pennsylvania, the Court indicated that the mere issuance of a license for a video poker machine, without a showing that the issuing authority had actual knowledge of the machines' intended illegal use, was insufficient support for a defense of *de facto* legality.

The Court cut short Mr. Amity's testimony on that basis. The Court allowed counsel for Defendant Ferrell to place a proffer of evidence on the record and subsequently to brief the adequacy of his proffer.

### (c) Defendant Ferrell's Proffer

In the course of the proceedings held on March 2, 1993, Defendant Ferrell can be fairly said to have proffered evidence of the following: Most of the licensing and permitting ordinances for the municipalities in question state something to the effect that no license or permit will be issued for illegal gambling devices or any device declared illegal by a court of competent jurisdiction; City of Pittsburgh Detective John Bosetti previously testified that pay-offs are made on all video poker machines; it is common knowledge that all video poker machines are used for illegal gambling; in many of the municipalities in question, the municipal police department or code enforcement officers enforce the licensing and permitting ordinances; in 1989, United States District Judge Gerald Weber had declared all video poker machines illegal *per se* under federal law in *United States v. 294 Various Gambling Devices*, 718 F.Supp. 1236 (W.D.Pa. 1989); the Supreme Court of Pennsylvania had declared all video poker machines equipped with knock-off and metering devices illegal; Mr. Amity and his partner communicated with 47 municipalities seeking information regarding the licensing and permitting of vending machines, including video poker machines; some municipalities licensed video devices generally and some licensed video poker machines specifically; certain municipalities had public meetings where the issue of the legality of video poker machines was discussed, and those municipalities continued to license and permit video poker machines and to collect licensing and permitting fees; Defendant Ferrell had compiled documents showing, for the years in question, the number of permits issued, in some instances to video devices generally, and in other instances for video poker machines specifically. Defendant Ferrell stated that it would be impossible for him to show that police or code officers had actual knowledge that the licensed or permitted devices were intended to be used or were used in illegal gambling activity.

*Brief of Defendant John F. "Duffy" Conley in Support of Motion to Dismiss on the Ground of Selective Prosecution (Document No. 750)*

Defendant Duffy Conley, in the first of his briefs, which was filed pursuant to the Court's Order granting in part and deferring in part the motion to adopt Ferrell's motions to dismiss filed by Defendants Duffy Conley

---

1. The municipalities concerned were the western Pennsylvania municipalities of Aspinwall, Avalon, Baldwin Borough, Bellevue Borough, Bethel Park, Braddock Hills, Brentwood, Bridgeville, Cecil, Collier, Dormont, Elizabeth, Etna, Findlay Glassport, Jefferson, Kilbuck, Leetsdale, McCandless, McKees Rocks, McKeesport, Mill-vale, Monroeville, Moon, Monongahela, Mount Lebanon, Munhall, North Huntington, O'Hare, Penn Hills, Peters, Pitcairn, Pleasant Hills, Reserve, Robinson, Ross, Scott, Shaler, South Park, Swissvale, Upper Burrel, West Deer, West Mifflin and West View.

and Curtin, made a proffer of evidence relative to the Defendants' selective prosecution argument. His proffer is summarized below.

The Federal Government, Pennsylvania State Police and the City of Pittsburgh Police Bureau have investigated activities involving video poker machines as early as 1986. During the entire period of these investigations, Duffy Conley and his associates transacted business involving video poker machines in an open, rather than a secret and clandestine, manner. They advertised their video poker machines; they engaged in promotions to attract players; they consented to be interviewed by the news media; and they paid local governments tens, if not hundreds, of thousands of dollars each year for licenses and permits.

Initially, the Federal Government investigated activities involving video poker machines for possible tax violations. In 1988 and 1989, the Federal Government's focus shifted to possible violations of racketeering statutes, such as operating an illegal gambling business, 18 U.S.C. § 1955, and money laundering, 18 U.S.C. § 1956. The federal government's power to investigate and prosecute persons for violations of these statutes depends on them being engaged in a gambling business which is illegal under Pennsylvania law.

Although it is illegal to use video poker machines as gambling devices in gambling activities, Pennsylvania law enforcement officials tolerate these machines.

Duffy Conley and others formed the Pennsylvania Association of Video Operators. Although Duffy Conley and organizations he controlled provided most of PAVO's financial support, others, such as Defendant Ferrell and one John Varney, a defendant in the only other video poker machine case in the Western District of Pennsylvania, also contributed to PAVO. As an organization, PAVO engaged in lobbying activities designed to introduce the merits of video poker machine gambling to members of the legislature. PAVO attempted to generate a groundswell of public support for its goals. PAVO circulated cards for members of the public to sign evidencing support for legalized video poker machine gambling. It obtained the support of members of the general assembly who became sponsors of the sought-after legislation.

PAVO's activities attracted the attention of law enforcement officials. State Police officers attended PAVO meetings and filed reports stating their observations. The State Police officers shared their knowledge with federal agents and Pittsburgh Police officers.

In the fall of 1989, shortly after the surveillance of PAVO, F.B.I. Special Agent John Donnelly ("S.A. Donnelly"), who was then investigating video poker machine activities unrelated to defendants in the instant case, had a chance meeting with Duffy Conley at the Main Hotel in Carnegie, Pennsylvania. Duffy Conley told S.A. Donnelly that the F.B.I. was wasting its time because video poker machine gambling was on the verge of becoming legal, rather than merely tolerated, in Pennsylvania.

A little over one month later, federal agents, along with state and local police officers, met with an Assistant United States Attorney to draft a one-hundred page affidavit in support of search warrants for business properties used by Duffy Conley and his organizations. Searches of 930 Saw Mill Run and 1300 Windgap Avenue were executed in December 1989. During the search of 1300 Windgap Avenue, Federal agents seized numerous records concerning PAVO, its contributors and supporters, and its activities.

PAVO's activities continued into the fall of 1990, when the Pennsylvania General Assembly enacted legislation legalizing video poker machines as gambling devices. Governor Casey, however, vetoed the legislation, which never became law. Within a year, a federal grand jury handed down the Indictment in this case.

Defendant Ferrell subpoenaed voluminous documents from local governments throughout Allegheny County. The documents reveal the names and addresses of persons who obtained licenses and permits to use video poker machines, beginning with the year 1984. The documents reveal that hundreds, if not thousands, of persons obtained such licenses and permits. Only the Defendants in this case and the defendants in the John

Varney case have been prosecuted by the Federal Government.

Testimony of federal, state, and local law enforcement officers reveals that video poker machines are used only for illegal gambling.

*Brief of Defendant John F. "Duffy" Conley in Support of Motion to Dismiss on Grounds that his Conduct was De Facto Legal, a De Minimus Infraction and a Lawful Exercise of Public Authority (Document No. 749)*

Duffy Conley, in the second of his briefs, which was filed contemporaneously with the first of his briefs and also filed pursuant to the Court's Order granting in part and deferring in part the motion to adopt Ferrell's motions to dismiss filed by Defendants Duffy Conley and Curtin, incorporates the facts proffered in the first of his briefs. His second brief alleges more facts and contains an Exhibit A, proffering further evidence.

Exhibit "A" to Defendant John F. "Duffy" Conley's Brief in Support of Phillip "Mike" Ferrell's Motions to Dismiss states:

Defendant John F. "Duffy" Conley is prepared to present the testimony of several witnesses, who, during the indictable period (1985–1991) served in an elected and/or supervisory position within various Allegheny County political subdivisions, those governing political bodies including, but not limited to, McKees Rocks Borough, Robinson Township, Kennedy Township and Brentwood Borough.

If presented an opportunity, each witness will testify that their respective municipal government bodies licensed and collected fees for video poker machines. The witnesses will also testify that they themselves and other government officials were aware that video poker machines license [sic] were being issued for video poker machines on which pay-offs were made.

These witnesses will testify that despite the fact that pay-offs were being made on these video poker machines, the respective governing bodies continued to issue permits. Additionally, these same witnesses will testify that the cost of the aforementioned permits increased annually, due to the fact that the governing bodies knew the amount of revenue generated by video poker machines, in contrast to the cost for non-poker video machines which remains the same during the indictable period.

Defendant is also prepared to present a document, dated April 30, 1992 from Thomas Corbett, U.S. Attorney for the Western District by Mary McKeen Houghton, Assistant U.S. Attorney to the Honorable Gustave Diamond. Said letter was sent to Judge Diamond, ex parte, in regards to a Civil Forfeiture action involving video poker machines found on Defendant Conley's premises, however, not owned by the Defendant.

Said correspondence specifically addresses a report prepared by Agent Holmes with respect to the illegality of a specific type of video poker machine. The letter details the government's attempt to withhold Agent Holmes' report from defense counsel on the basis that it may encourage allegation of selective prosecution with respect to current indictments regarding gambling devices.

Brief of Defendant John F. "Duffy" Conley in Support of Motion to Dismiss on Grounds that his Conduct was De Facto Legal, a De Minimus Infraction and a Lawful Exercise of Public Authority, Exhibit "A" at 1–2 (Document No. 749, Exhibit "A").

In the second of his briefs, Defendant Duffy Conley reiterates that law enforcement personnel from the federal, state and local level have testified that, to the knowledge of each, video poker machines are used solely for gambling purposes.

Duffy Conley also states the following:

"Duffy" Conley's view that video poker machines have attained the status of *de facto* legality is shared by Attorney General Ernie Preate. He testified before a legislative committee on May 24, 1990 that, when he assumed office (which was in January, 1989): "In most areas of Pennsylvania, video poker machines were so widespread, enforcement efforts were so intermittent and the resulting sanctions so minor that the situation was tantamount to the de facto legislation of video poker gambling. Machines, numbering in the tens of thousands, were found through out Penn-

sylvania." (Ex. 21–Y) "Duffy" Conley contends that this is, and throughout the period covered by the Indictment has been, the case.

Brief of Defendant John F. "Duffy" Conley in Support of Motion to Dismiss on Grounds that his Conduct was De Facto Legal, a De Minimus Infraction and a Lawful Exercise of Public Authority at 2–3 (Document No. 749).[2] Duffy Conley's second brief also alludes to the aforementioned stipulation between Defendant Ferrell and the Government (Document No. 509) and the procedural history of these motions outlined above.

*Defendant John F. "Duffy" Conley's Omnibus Brief in Response to the Court's February 3, 1994 Summary Order of Court (Document No. 834)*

In response to issues raised at the January 27, 1994 status conference, and pursuant to the Court's Summary Order of Court (Document No. 821), Defendant Duffy Conley filed the third, and final, of his briefs. (Document No. 834). After reviewing the procedural history of the case, he reiterates certain of the facts previously proffered and includes Exhibit "A" to the second of his briefs as an exhibit to his third brief. The only new fact arguably proffered is that no municipality or municipal official is being prosecuted under 18 U.S.C. § 1955 or 18 U.S.C. § 1956.

*Defendant Kenneth W. "Ron" Goodwin's Motion to Reopen the Record (Document No. 835)*

In response to issues raised at the January 27, 1994 status conference, and pursuant to the Court's Summary Order of Court (Document No. 821), Defendant Goodwin filed his Motion to Reopen Record, (Document No.

2. Exhibit 21–Y is a document entitled Prepared Statement of Attorney General Ernest D. Preate, Jr. before the House of Representatives Finance Committee, May 24, 1990. The language quoted by Defendant Duffy Conley was extracted from the following context:

Because of the difficulty in proving machines are per se illegal under state law, and because police undercover resources are—properly—allocated far more heavily to combatting violent crime and the drug fight than to combatting video poker, video poker gambling was out of control when I took office as Attorney General.

In most areas of Pennsylvania, video poker machines were so wide spread, enforcement efforts were so intermittent and the resulting sanctions so minor that the situation was tantamount to the de facto legalization of video poker gambling. Machines, numbering in the tens of thousands were found throughout Pennsylvania.

I was determined that I would not allow that to happen on my watch. As long as video poker is illegal, we in the law enforcement have a duty to prosecute violators. If the Legislature wishes to legalize video poker, that is your decision to make. But we cannot legalize video poker by having the police look the other way. When the police ignore blatantly illegal activity it breeds contempt for the law, economically coerces honest tavern owners and vending machine distributors into joining the illegal activity and, as we have seen in at least one case, can attract the mob.

So I set out to develop a comprehensive plan to crack down on this blatantly illegal activity, and to do so *without* having to commit new law enforcement resources to the fight.

*Id.* at 3–4 (emphasis in original). The Attorney General discussed the enforcement efforts of federal, state, and local authorities, including enforcement efforts by the U.S. Attorney for the Western District of Pennsylvania in 1989. The Attorney General concluded his discussion of enforcement efforts, "But in summary, after a period in which video poker almost became legal by default, we now have in place a program which has resulted in a high degree of compliance with the law." *Id.* at 7.

The Attorney General did not take a position on the bill before the committee, HB 2300, which would have legalized and regulated video poker activity. After discussing the funding of law enforcement efforts to regulate video poker machines where they are legal and illegal, the Attorney General concluded his remarks as follows:

Mr. Chairman, I urge this committee and the Legislature to make a clear choice and give law enforcement clear direction. Either tell us that you want legalized video poker, and provide tough regulations and a comprehensive, self-financing enforcement program. Or tell us that you want to keep video poker illegal—that you want us to arrest and prosecute violators—and give us the resources to do the job right. But please don't leave all of us in the unsatisfactory position we are in now.

We must not allow the Commonwealth to backslide into the position we were in before February, when video poker had almost achieved de facto legalization in Pennsylvania. Give us your direction. Thank you.

*Id.* at 10.

835), which contains his proffer of evidence. Defendant Goodwin's proffer states:

The Pennsylvania Liquor Code is administered and enforced by the following agencies:

a) The Licensing Bureau of the PLCB is charged with the responsibility of administering the Liquor Code and, more specifically, investigating applications for transfer of various types of liquor licenses.

b) The State Police Bureau of Liquor Control Enforcement (hereinafter referred to as "LCE") is charged with responsibility of enforcing the laws set forth in the Pennsylvania Liquor Code and other laws of the Commonwealth which may be violated by liquor licensees.

c) The Pennsylvania State Police at times investigate and enforce the same areas as the LCE.

A supervisor of the Pittsburgh office of the Licensing Bureau of the PLCB will present testimony containing the following:

1. During any investigation for licensing purposes, if a video poker machine is observed, the investigating officer does nothing; no report is made of the observation.

2. The supervisor has never been questioned by any of the investigating officers whom he directs as to what action, if any, should be taken in regard to video poker machines seen during a licensing investigation.

3. There is no policy of the PLCB issued to the Licensing Bureau in regard to video poker machines.

A supervisor in the Pittsburgh office of the LCE will present testimony containing the following:

1. The LCE has never pursued a program against video poker machines solely as gambling devices per se.

2. If officers are conducting an investigation, they merely observe in their reports that video poker machines were seen on licensed premises; no enforcement action is taken.

3. Video poker machines are seized and/or citation proceedings issued only if officers observe a payoff or if there have been other complaints and evidence which can substantiate a payoff.

4. From the time of its inception in 1987, the LCE has not changed the aforesaid policies. Following Judge Weber's Decision in 1989, the LCE was anticipating a change, but no change was ever made.

A supervisor of the Vice and Intelligence Squad of the Pennsylvania State Police will present testimony containing the following:

1. In regard to video poker machines, this agency arrests and confiscates machines resulting from payoffs only [sic].

2. The State Police normally do not prosecute for possession of video poker machines per se.

3. Some video poker machines are confiscated as a result of a complaint.

4. Some of their confiscations are conducted as a result of observations made during investigations for other purposes.

5. There has been no change in State Police policy as a result of Judge Weber's Decision.

6. When the State Police confiscate machines and file gambling charges under Section 5513 of the Pennsylvania Criminal Code, the criminal charges brought against the bartender or other person making a payoff on the machine are frequently dismissed by he [sic] magistrate, with the bartender being permitted to plead guilty to the summary offense of disorderly conduct.

*Id.* at 2–4. Defendant Goodwin also asks that he and other defendants be given an opportunity to research and subsequently proffer items from the news media in support of Defendant Ferrell's motions to dismiss.[3]

---

**3.** In ruling, the Court will not speculate as to what may be found in the news media. Given that Defendant Goodwin filed his proffer approximately two years and five months after the Indictment, one year and eight months after Defendant Ferrell filed his motions to dismiss and eleven months after the hearing on the motions was held, the Court will deny Defendant Goodwin's motion to supplement his proffer with the contents of materials that have been available to him throughout.

## DISCUSSION

### "De Facto Legality of Video Poker Machine Gambling"

#### The Contentions

Defendants frame this issue as follows:

When it is common knowledge among law enforcement officials that video poker machines are used for gambling purposes alone and when local governments issue licenses and permits authorizing such devices to be placed within their borders, have such machines achieved the status of *de facto* legality notwithstanding a state statute prohibiting gambling.

Brief of Defendant John F. "Duffy" Conley in Support of Motion to Dismiss on Grounds that his Conduct was De Facto Legal, a De Minimus Infraction and a Lawful Exercise of Public Authority, at 1–2 (Document No. 749). The essence of the argument is that video poker machines are used for gambling, and nothing else, and local, municipal authorities, by issuing licenses and permits for video poker machines, "created an atmosphere of *de facto* legality with respect to the use of these devices." *Id.* at 2. Further, the Defendants' failure to show that the municipal authorities issued licenses and permits having specific knowledge that the video poker machines were to be used for gambling purposes is contended to be irrelevant because "municipalities, like every one else, cannot close their eyes to what occurs over a long period of time on an everyday basis." *Id.* at 3. Relying on 42 U.S.C. § 1983, Defendants contend that the common knowledge of municipal employees and the permissive atmosphere surrounding video poker machines combined into a practice so permanent and well settled as to have the force of law to bind municipal decision-makers.[4]

The Government challenges the adequacy of the record upon which Defendants rely, contending that the proffers are untimely.[5] Further, the Government challenges the legal sufficiency of the Defendants proffers under the applicable law. Specifically, the Government contends that where a Due Process challenge based upon misleading government conduct is raised as a defense to a federal crime, assurances of legality must come from a federal official. Moreover, the Government contends that the municipalities' issuing of permits and licenses in the alleged permissive atmosphere in Pennsylvania is not the type of government conduct sufficient to make out the defense. Finally, the Government points to uncontested—and uncontestable—evidence in the record, but outside of the Defendants' proffers, demonstrating that the Defendants activities had long been subject to raids and enforcement activities by local, state and federal authorities.

#### Procedure and Standard of Review

The font of the reliance on misleading government conduct defense that Defendants assert is three cases decided by the Supreme Court of the United States: *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973); *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); and *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959). The procedure and standard of review to be employed by the court is inextricably bound with the nature of the Due Process concerns expressed in the aforementioned Supreme Court decisions.

#### The Supreme Court Cases

##### Raley v. Ohio

In *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), the Supreme Court reversed the convictions of three out of four individuals, who had been convicted of

---

4. On the one hand, Defendants contend that they are relying upon the Due Process impediment to prosecution that arises in certain circumstances. *See, e.g., United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). On the other hand, Defendants contend that the permissive atmosphere surrounding video poker machines supports a finding of a lack of the requisite intent to commit a crime. As will be discussed, these are distinct contentions that must be separately treated by the Court.

5. The Court rejects this challenge because, while its initial Order permitting Defendants to proffer evidence was limited to each Defendant's connection to the record created by former counsel for Defendant Ferrell, its latest Order permitting further proffers was not limited in such a manner.

not answering, on the basis of the Ohio privilege against self-incrimination, questions put to them by the legislative Un–American Activities Commission of the State of Ohio. The conviction to the fourth individual was affirmed by an equally divided court.[6]

Three defendants, including the defendant whose conviction was affirmed, were convicted under an Ohio statute providing that " 'a failure * * * to answer as a witness, when lawfully required' may be punished 'as for a contempt.' " *Id.* at 424 n. 1, 79 S.Ct. at 1259 n. 1 (quoting Ohio Gen.Code 12137). The fourth defendant was convicted under an Ohio statute punishing "those, summoned before a Committee of the State Legislature, who refuse 'to answer a question pertinent to the matter under inquiry.' " *Id.* (quoting Ohio General Code 12845). The Ohio statutes did not require that the refusal to answer be willful or deliberate. *See id.* at 444 n. 3, 79 S.Ct. at 1257 n. 3 (Opinion of Clark, J.). All of the defendants waived their right to a jury trial and were convicted in two bench trials. *Id.* at 432, 433, 79 S.Ct. at 1263, 1263.

Several members of the Ohio Un–American Activities Commission had expressly or impliedly informed the defendants that the Ohio privilege against self-incrimination was available to them in the proceedings before the Commission. The members of the Committee were wrong. As a matter of Ohio law, a transactional immunity statute, which applied by operation of law, divested persons

appearing before the Ohio legislature of the Ohio privilege. The Supreme Court of the United States explained how the problem before it arose:

> The Ohio immunity statute extends, so far as is here relevant, to any person appearing before a legislative committee and grants immunity from state prosecutions or penalties 'on account of a transaction, matter, or thing, concerning which he testifies'; the statute declares that the testimony given on such an appearance 'shall not be used as evidence in a criminal proceeding' against the person testifying. Ohio Rev.Code, s 101.44. For reasons unexplained, the existence of this immunity was never suggested by the Commission to any of the appellants, and in fact, as the above statement makes evident, the Commission's actions were totally inconsistent with a view on its part that the privilege against self-incrimination was not available. The Commission thought the privilege available, and it gave positive advice that it could be used.

*Id.* at 431–32, 79 S.Ct. at 1263. The Ohio Supreme Court, relying on the maxim that all are presumed to know the contents of the law, held that the offenses were established by the defendants' failure to answer the questions, notwithstanding the Commission's erroneous assurances to the contrary. *Id.* at 425, 79 S.Ct. at 1259.

Avoiding numerous other questions,[7] the Supreme Court of the United States held

---

6. The Opinion of the Court with respect to the three individuals whose convictions were overturned did not "reverse and remand for proceedings not inconsistent with" the Opinion. The Opinion simply reversed. There was a suggestion that one of the individuals whose convictions were reversed refused to answer a question on grounds other than the privilege against self incrimination. Of this, the Opinion of the Court stated, "It is suggested that Brown declined to answer one question other than on grounds of self-incrimination. No such finding was made by the Ohio Supreme Court, which treated the entire case as involving pleas of self-incrimination; accordingly, so do we." *Raley*, 360 U.S. at 440 n. 15, 79 S.Ct. at 1268 n. 15. The Opinion of the four concurring Justices contemplated further proceedings in the Ohio courts. It stated, "On the record here, we find no specific direction to Brown to answer, and thus we must concur in the reversal of Brown's conviction.

The question of the sufficiency of the plea will, of course, be open on remand." *Id.* at 443 n. 1, 79 S.Ct. at 1269 n. 1 (Opinion of Clark, J.). Given that the Court was unanimous in simply reversing Brown's conviction, it is not clear what the purpose of the further proceeding was to be.

7. Issues that were avoided included the power of state legislatures to investigate activities deemed subversive to the Nation, the power of a state to compel testimony related to First Amendment activity, the existence of expressed legislative interest for such an inquiry and its articulation to witnesses, and the validity of state immunity statutes not affording immunity from federal prosecution. *Id.* at 425, 79 S.Ct. at 1259. Other avoided issues were whether a state must expressly reject a claimed privilege against self-incrimination before the failure to testify may be punished and whether notice to witnesses of the immunity law that acted as the basis on which

that as to three of the four defendants "the judgments of conviction rendered below violate the Due Process Clause of the Fourteenth Amendment." *Id.* at 437, 79 S.Ct. at 1266. The Court stated:

> This case is more than ... [one involving failure to give notice]; here the Chairman of the Commission, who *clearly appeared to be the agent of the State in a position to give such assurances,* apprised three of the appellants that the privilege in fact existed, and by his behavior toward the fourth obviously gave the same impression. Other members of the Commission and its counsel made statements which were totally inconsistent with any belief in the applicability of the immunity statute, and it is fair to characterize the whole conduct of the inquiry as to the four as identical with what it would have been if Ohio had had no immunity statute at all. Yet here the crime said to have been committed by the appellants, as defined by the State Supreme Court, was *simply that of declining to answer any relevant question on the ground of possible self-incrimination.* This was because the Court held that the Ohio immunity statute automatically removed any basis for a valid claim of the privilege, which generally exists under Ohio law. Ohio Const., art. I, s 10. Accordingly, any refusal to answer, based on a claim of the privilege, was said to constitute the offense. *While there is no suggestion that the Commission had any intent to deceive the appellants,* we repeat that to sustain the judgment of the Ohio Supreme Court on such a basis after the Commission had acted as it did would be to sanction the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him.... A State may not issue commands to its citizens, under criminal sanctions, in language so *vague and undefined* as to afford no *fair warning* of what conduct might transgress them.... Inexplicably *contradictory commands* in statutes ordaining criminal penalties have, in the same fashion, judicially been denied the force of criminal sanctions.... *Here there*

*were more than commands simply vague or even contradictory. There was active misleading* .... The State Supreme Court dismissed the statements of the Commission as legally erroneous, but the fact remains that at the inquiry they were *the voice of the State most presently speaking to the appellants.* We cannot hold that the Due Process clause permits convictions to be obtained under such circumstances.

*Id.* at 437–39, 79 S.Ct. at 1266–67 (emphasis added; footnotes and citations omitted).

Both of the Opinions in *Raley* quote the dissenting opinion of Judge Stewart of the Ohio Supreme Court, which stated, " 'since the defendants were apprised by the commission at the time they were testifying that they had a right to refuse to answer questions which might incriminate them, they could not possibly in following the admonition of the commission be in contempt of it * * *.' " The Supreme Court nonetheless accepted Ohio law as declared by the majority of the Ohio Supreme Court, to wit, the offense did not require willful or deliberate refusal to answer, but only a failure to answer based on the unavailable privilege. While the Court's concern with vagueness, fair warning and the consistency of directives from apparently authoritative State sources is evident, the Court's Due Process defense did not find lacking evidence of an implied specific intent requirement. Rather, the Court found that the Commission had actively misled the defendants into committing the offense defined by the statute and the Ohio courts.

The Opinion of Justice Clark prevailed on the issue upon which the Court was equally divided. One defendant's conviction was based upon a question that the defendant was in fact directed to answer. Because the Defendant had been directed, rightly or wrongly, to answer the question, "there could be no entrapment and hence no lack of due process." *Id.* at 445, 79 S.Ct. at 1270.

### Cox v. Louisiana

The Supreme Court returned to the Due Process reliance on misleading government

answers were required must be given. *Id.* at 437, 79 S.Ct. at 1265.

conduct defense in *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). In that case, Cox had led a demonstration within sight and hearing of a courthouse—approximately 101 feet from the courthouse steps—to protest the arrest of numerous civil rights demonstrators. He appealed from his conviction in a bench trial[8] under a Louisiana statute that prohibited picketing and parading "in or near" a state courthouse, with the intent to obstruct justice or influence any judicial officer. *Id.* at 560, 85 S.Ct. at 478.

Cox first raised a facial challenge to the statute on First Amendment grounds. The Court rejected the facial challenge. It found the statute was a reasonable, narrowly drawn statute regulating specific conduct, which the state had a legitimate interest in regulating, in specific places—in or near a courthouse. *Id.* at 562–64, 85 S.Ct. at 479–81. Cox then raised a challenge to the statute as applied, which the Court also rejected. *Id.* at 564–66, 85 S.Ct. at 480–82.

Significantly, Cox also sought reversal of his conviction on the Due Process ground, *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), that there was no evidence of *intent* to obstruct justice or influence any judicial officer. Finding evidence of the requisite criminal intent in the record, the Court rejected this challenge. *Id.* 379 U.S. at 566–67, 85 S.Ct. at 481–82.

The Court nonetheless reversed Cox's conviction. It stated that there is "some lack of specificity in a word such as 'near.'" *Id.* at 568, 85 S.Ct. at 483. The Court continued:

> While this lack of specificity may not render the statute unconstitutionally vague, at least as applied to a demonstration within the sight and hearing of those in the courthouse, it is clear that the statute, with respect to the determination of how near the courthouse a particular demonstration can be, foresees a degree of on-the-spot administrative interpretation by officials charged with administering and enforcing it. It is apparent that demonstrators, such as those involved here, would justifiably

tend to rely on this administrative interpretation of how "near" the courthouse a particular demonstration might take place. ... This administrative discretion to construe the term "near" concerns a limited control of the streets and other areas in the immediate vicinity of the courthouse and is the type of narrow discretion which this Court has recognized as the proper role of the responsible official in making determinations concerning the time, place, duration, and manner of demonstrations. ... Nor does this limited administrative regulation of traffic which the Court has consistently recognized as necessary and permissible, constitute a waiver of law which is beyond the power of the police. Obviously telling demonstrators how far from the courthouse steps is "near" the courthouse for purposes of a permissible demonstration is a far cry from allowing one to commit, for example, murder, or robbery.

*Id.* at 568–69, 85 S.Ct. at 483 (citations and footnotes omitted). After reviewing the evidence of record, the Court determined that it was uncontradicted that:

> ... the highest police officials of the city, in the presence of the Sheriff and Mayor, in effect told the demonstrators that they could meet where they did, 101 feet from the courthouse steps, but could not meet closer to the courthouse. In effect, appellant was advised that a demonstration at the place it was held would not be one "near" the courthouse within the terms of the statute.

*Id.* at 571, 85 S.Ct. at 484. Under all the circumstances of the case, the Court held that Due Process and *Raley* did not permit the conviction to stand. *Id.* The Court made clear, however, that it was not redefining the meaning of "near" under the state statute. *Id.* at 571–72, 85 S.Ct. at 484–85.

### *United States v. Pennsylvania Industrial Chemical Corp.*

The Supreme Court's last pronouncement on the Due Process reliance on misleading

---

**8.** That he was convicted in a bench trial appears in the companion case, which has the same caption but a different citation. *Cox v. Louisiana,* 379 U.S. 536, 538, 85 S.Ct. 453, 455, 13 L.Ed.2d 471 (1965).

government conduct defense was contained in *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). After a jury trial,[9] Pennsylvania Industrial Chemical Corporation ("PICCO") had been convicted under Section 16 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 411, of discharging refuse matter in August 1970 without a permit from the Secretary of the Army, in violation of 33 U.S.C. § 407.[10] *Id.* at 658–60, 93 S.Ct. at 1808–10. The Court of Appeals for the Third Circuit reversed on two grounds. First, it held that Section 13 was not operative in the absence of formalized permit procedures. *Id.* at 660, 93 S.Ct. at 1809. Second, it held that the district court erred in disallowing PICCO's "offer of proof that it had been affirmatively misled by the [Army] Corps of Engineers into believing that it was not necessary to obtain a § 13 permit for the discharge of industrial effluents such as those involved in [the] case," because such facts, if true, would render the conviction fundamentally unfair. *Id.* at 661, 93 S.Ct. at 1810.

The Supreme Court rejected the Court of Appeals' first ground. It accepted the Court of Appeals' second ground and remanded the case to the district court for further proceedings.

The Supreme Court first noted that the issue was not whether Section 13 applied to effluent discharges having no tendency to impede navigation. The Court indicated that several years earlier, in *United States v. Standard Oil Co.*, 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966), it had held the term "refuse" in Section 13 included "all foreign substances and pollutants," and indicated that all lower courts but one[11] had subsequently read Section 13 "as imposing a flat ban on the unauthorized deposit of foreign substances into navigable waters, regardless of the effect on navigation." *Penn-*

*sylvania Indus. Chem. Corp.*, 411 U.S. at 671, 93 S.Ct. at 1815 (citations omitted).

The Court found it undisputed, however, that the Army Corps of Engineers continued to construe Section 13 as limited to water deposits that affected navigation from 1966 through the time of the offense conduct. The Corps of Engineers had issued in the mean time a new regulation so indicating in a complete revision of its regulations. *Id.* at 672–73, 93 S.Ct. at 1815–16.

After distinguishing PICCO's contentions from assertions of ignorance of the law and an unconstitutionally vague statute, the Court explained the relevance of the regulation, stating:

> Of course, there can be no question that PICCO had a right to look to the Corps of Engineers' regulations for guidance. The Corps is the responsible administrative agency under the 1899 Act, and 'the rulings, interpretations and opinions of the (responsible agency) . . ., while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which . . . litigants may properly resort for guidance.' . . . Moreover, although the regulations did not of themselves purport to create or define the statutory offense in question, . . . it is certainly true that their designed purpose was to guide persons as to the meaning and requirements of the statute. Thus, to the extent that *the regulations deprived PICCO of fair warning as to what conduct the Government intended to make criminal,* we think there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution.

*Id.* at 674, 93 S.Ct. at 1816 (emphasis added). In response to the Government's urging, the Court declined to hold that under all the

---

9. 411 U.S. at 660, 93 S.Ct. at 1809.

10. Section 16 provided, in part, that "Every person and corporation that shall violate . . . sections 407, 408, and 409 of this title shall be guilty of a misdemeanor. . . ." *Pennsylvania Indus.*

*Chem. Corp.*, 411 U.S. at 656–57 n. 1, 93 S.Ct. at 1807–08 n. 1 (quoting 33 U.S.C. § 411).

11. *Guthrie v. Alabama By–Products Co.*, 328 F.Supp. 1140 (N.D.Ala.1971), *aff'd*, 456 F.2d 1294 (5th Cir.1972), *cert. denied*, 410 U.S. 946, 93 S.Ct. 1352, 35 L.Ed.2d 613 (1973).

circumstances the regulation was not misleading. The Court stated:

> [W]e need not respond to the Government's arguments here, for the substance of those arguments pertains, not to the issue of the availability of reliance as a defense, but rather to the issues whether there was in fact reliance and, if so, whether that reliance was reasonable under the circumstances—*issues that must be decided in the first instance by the trial court.* At this stage, it is sufficient that we hold that it was error for the District Court to refuse to permit PICCO to present evidence in support of its claim that it had been affirmatively misled into believing that the discharges in question were not a violation of the statute.

*Id.* at 675, 93 S.Ct. at 1817 (emphasis added).

### Procedure

Before proceeding to address the merits of Defendants' Due Process reliance on misleading government conduct defense, the Court must first turn to the related issues of the procedures and standard of review to employ. The first issue is whether the Court is to adjudicate the motions or whether the Court is to merely determine if Defendant's have proffered evidence sufficient to create an issue for the jury.

▮ In the lower courts, the Due Process reliance on misleading government conduct defense has come to be known as the "entrapment by estoppel" defense. *See, e.g., United States v. Nichols,* 21 F.3d 1016, 1017 (10th Cir.1994); *United States v. Weitzenhoff,* 1 F.3d 1523, 1534 (9th Cir.1993); *United States v. Billue,* 994 F.2d 1562, 1568 (11th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 939, 127 L.Ed.2d 230 (1994); *United States v. Bazargan,* 992 F.2d 844, 849 (8th Cir.1993); *United States v. Clark,* 986 F.2d 65, 69 (4th Cir.1993); *United States v. Levin,* 973 F.2d 463, 468 (6th Cir.1992); *United States v. LaChapelle,* 969 F.2d 632, 637 (8th Cir.1992); *United States v. Smith,* 940 F.2d 710, 714 (1st Cir.1991); *United States v. Austin,* 915 F.2d 363, 365–66 (8th Cir.1990), *cert. denied,* 499 U.S. 977, 111 S.Ct. 1626, 113 L.Ed.2d 722 (1991); *United States v. Hedges,* 912 F.2d 1397, 1404 (11th Cir.1990); *United*

*States v. Tallmadge,* 829 F.2d 767, 773 (9th Cir.1987); *see also United States v. Bruscantini,* 761 F.2d 640, 641 (11th Cir.), *cert. denied,* 474 U.S. 904, 106 S.Ct. 271, 88 L.Ed.2d 233 (1985) ("estoppel argument"). The interpretations given the defense have been less than uniform. For instance, some courts have emphasized the defense requires distinct elements of a defense be proved or have focused on the failure of the evidence to establish a particular element as formulated by the court. *See, e.g., Billue,* 994 F.2d at 1568–69; *United States v. Etheridge,* 932 F.2d 318, 321 (4th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 323, 116 L.Ed.2d 264 (1991); *Tallmadge,* 829 F.2d at 776–77 & nn. 1–2 (Kozinski, J., dissenting); *Bruscantini,* 761 F.2d at 641–42. Other courts, emphasizing the fundamental fairness Due Process roots of the defense, have given the defense a more fluid definition. *See, e.g., United States v. Nichols,* 21 F.3d at 1017; *Weitzenhoff,* 1 F.3d at 1534; *Levin,* 973 F.2d at 468; *Smith,* 940 F.2d at 714; *Hedges,* 912 F.2d at 1405; *United States v. Brady,* 710 F.Supp. 290, 295 (D.Colo.1989) ("... Cox and Raley make clear that the purpose of the rule is to prevent fundamental unfairness and injustice. Though the defense recognized by Raley and Cox has been called 'entrapment by estoppel' it is not an estoppel at all in any meaningful sense. Neither Cox nor Raley use the word 'estoppel' even once. The doctrine stems from the due process clause, not from the common law of contract, equity or agency").

At first blush, it appears that the proposition upon which the courts can agree is that the defense presents a jury question when it is based upon disputed facts. Nevertheless, a close examination of the cases reveals that few courts have declined, in favor of a jury determination, to rule for or against the defense.

In a variety of procedural contexts, the vast majority of cases have held, as a matter of law, that the defense was unavailable on the facts of the case. *Nichols,* 21 F.3d at 1017–1019 (affirming denial of motion to appoint psychological expert to testify in support of the defense); *Weitzenhoff,* 1 F.3d at 1534–35 (refusal to instruct jury upheld); *Billue,* 994 F.2d at 1569 (refusal to instruct

jury upheld); *LaChapelle,* 969 F.2d at 637–38 (refusal to instruct jury upheld); *United States v. Hurst,* 951 F.2d 1490, 1499 (6th Cir.1991) (refusal to instruct jury upheld), *cert. denied,* —— U.S. ——, 112 S.Ct. 1952, 118 L.Ed.2d 556 (1992); *United States v. Brebner,* 951 F.2d 1017, 1024–27 (9th Cir. 1991) (affirming exclusion of evidence purporting to raise the defense as immaterial as a matter of law); *Smith,* 940 F.2d at 711–12, 715 (affirming exclusion of evidence purporting to raise the defense as immaterial as a matter of law); *United States v. Etheridge,* 932 F.2d 318, 320–21 (4th Cir.1991) (order granting motion in limine precluding evidence upheld); *Austin,* 915 F.2d at 367 (refusal to instruct jury upheld); *Ostrosky v. Alaska,* 913 F.2d 590, 596 n. 15, 599 (9th Cir.1990) (in habeas corpus proceeding, district court erred as a matter of law in granting relief on the basis of the defense); *Bruscantini,* 761 F.2d at 641–42 (appellate ruling as a matter of law on the record); *United States v. Lansing,* 424 F.2d 225, 225–26 (9th Cir.1970) (appellate refusal of defense after bench trial where no findings of fact were made).

Most of the few courts that have held defendants were entitled on the facts to assert the defense have upheld the defense as a matter of law. *Levin,* 973 F.2d at 465–66, 468, 470 (after Federal Rule of Civil Procedure 12(b) hearing on the basis of "undisputed extrinsic evidence," the district court held that the prosecution could not prove "intent" [pp. 465–66]; court of appeals affirmed, holding that prosecuting the defendants violated Due Process [p. 468] and the district court properly found facts on "intent" [p. 470]; *Tallmadge,* 829 F.2d at 768–69, 775 (after bench trial on stipulated facts and limited undisputed testimony, court of appeals held prosecuting defendant violated Due Process); *Brady,* 710 F.Supp. at 294–96 (bench trial).

The Court's research has revealed only a single appellate case directly holding that a new trial must be held to allow the jury to determine the "entrapment by estoppel" defense. *Hedges,* 912 F.2d at 1404–06; *see also United States v. Evans,* 928 F.2d 858 (9th Cir.1991), *aff'g,* 712 F.Supp. 1435, 1442–43 (D.Mont.1989). The Court's research also revealed a district court case from this district that denied a motion to dismiss the indictment because the Due Process defense was held to raise factual issues for the jury. *United States v. Gulf Oil Corp.,* 408 F.Supp. 450, 460–62 (W.D.Pa.1975) (Snyder, J.).

Notwithstanding the procedural postures in which the Due Process defense is now customarily raised and the few precedents squarely holding that the defense presents a jury issue on disputed facts, the Court holds that the defense should be raised by pretrial motion and the Court may conclusively determine the defense, resolving factual disputes as necessary.

Rule 12 of the Federal Rules of Criminal Procedure provides in pertinent part:

**(b) Pretrial Motions.** Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:

(1) Defenses and objections based on defects in the institution of the prosecution. . . .

\* \* \* \* \* \*

**(e) Ruling on Motion.** A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.

Because the Defendants have timely moved to dismiss the indictment prior to trial, the Court has no need to determine whether the Due Process reliance on misleading Government conduct defense is based upon a "defect in the institution of the prosecution." *Cf. United States v. Gonzales,* 927 F.2d 139, 143–44 (3d Cir.1991); *see also* Fed.R.Crim.P. 12(h) (suggesting that all such defects may be remedied by re-institution of the prosecution). The procedural question presented is whether the Due Process defense "is capable

of determination without the trial of the general issue...." Fed.R.Crim.P. 12(b). The Court concludes that it is.

■ "A defense is thus 'capable of determination' if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense. [Former] Rule 12(b)(4) allows the District Court in its discretion to postpone determination of the motion to trial, and permits factual hearings prior to trial if necessary to resolve issues of fact peculiar to the motion." *United States v. Covington,* 395 U.S. 57, 60, 89 S.Ct. 1559, 1561, 23 L.Ed.2d 94 (1969). As the Court will show, under the Due Process reliance on misleading government conduct defense, the facts alleged to constitute the crime and the evidentiary support therefore, whether before the grand jury or the petit jury, are irrelevant, and the allegations of the indictment may be assumed to be true. Because the theory advanced by the Defendants, if accepted on the facts and law, "require[s] the Court to direct acquittal and ... [does] not attempt to contradict the material allegations of the indictment," *Gulf Oil Corp.,* 408 F.Supp. at 459, the theory is properly determined by the Court before trial.[12]

It is true that some courts and judges have held that the Due Process reliance on government misconduct defense implicates the element of intent to commit the crime. *Etheridge,* 932 F.2d at 321; *Tallmadge,* 829 F.2d at 781–82 (Kozinski, J., dissenting); *Brus-*

*cantini,* 761 F.2d at 641–42; *Gulf Oil Corp.,* 408 F.Supp. at 463; *see also, Levin,* 973 F.2d at 466, 468–70 (alternative holding). The Court believes that the Supreme Court precedents, as well as the better reasoned lower court cases, are to the contrary.

■ None of the Supreme Court cases involved crimes requiring proof of specific intent in the sense of an intent to violate a known legal duty. *Pennsylvania Indus. Chem. Corp.,* 411 U.S. at 656–57 n. 1, 93 S.Ct. at 1807–08 n. 1; *Cox,* 379 U.S. at 566–67, 85 S.Ct. at 481–82; *Raley,* 360 U.S. at 424 n. 1, 79 S.Ct. at 1259 n. 1; *id.* at 444 n. 3, 79 S.Ct. at 1269 n. 3 (Opinion of Clark, J.). Moreover, in *Cox,* the Court specifically addressed the defendant's *Thompson*[13] challenge to the evidence of required intent under the Louisiana statute, finding that there was evidence to support the finding that the defendant had the requisite intent. *Cox,* 379 U.S. at 566–67, 85 S.Ct. at 481–82. None of the Court's rulings were made in terms of the evidence's failing to meet an element of intent, and the Court did not claim the power to alter the offenses as defined by the respective legislatures. Thus, the issue of fundamental unfairness due to the defendant's reliance on misleading government conduct is independent of the element of intent. *Brebner,* 951 F.2d at 1025; *Smith,* 940 F.2d at 714; *Hedges,* 912 F.2d at 1405; *Tallmadge,* 829 F.2d at 772, 774–75; *Brady,* 710 F.Supp. at 296 ("This defense does not merely negate intent,

12. A judgment of acquittal in such circumstances would not bar further prosecution under the Double Jeopardy Clause, and hence would not bar an appeal of the judgment by the Government under 18 U.S.C. § 3731. The judgment would have been entered without the trier of fact beginning to determine the truth of the allegations of the indictment. *Serfass v. United States,* 420 U.S. 377, 391–92, 95 S.Ct. 1055, 1064, 43 L.Ed.2d 265 (1975) ("Although an accused may raise defenses or objections before trial which are 'capable of determination without the trial of the general issue,' ... and although he must raise certain other defenses or objections before trial, ... in neither case is he 'subjected to the hazards of trial and possible conviction.' ... Moreover, in neither case would an appeal by the United States 'allow the prosecutor to seek to persuade a second trier of fact of the defendant's guilt after having failed with the first.' ... Both the history of the Double Jeopardy Clause and its

terms demonstrate that it does not come into play until a proceeding begins before a trier 'having jurisdiction to try the question of the guilt or innocence of the accused.' ... Without risk of a determination of guilt, jeopardy does not attach, and neither an appeal nor further prosecution constitutes double jeopardy") (citations omitted); *United States v. Gallagher,* 602 F.2d 1139, 1141 n. 1 (3d Cir.1979), *cert. dismissed,* 444 U.S. 1040, 100 S.Ct. 713, 62 L.Ed.2d 675 (1980). Of course, if it is held on appeal from such a judgment of acquittal that Due Process bars prosecution, Due Process would bar further prosecution as well.

13. Pursuant to *Thompson v. Louisville,* 362 U.S. 199, 80 S.Ct. 624, Cox argued that his conviction violated due process as there was no evidence of intent to obstruct justice or influence any judicial official as required by statute.

it negates the criminality of the act").[14]

It may appear that the Due Process reliance on misleading government conduct defense is not determinable without invading the jury's province with respect to crimes requiring proof of specific intent in the sense of intentional violation of a known legal duty. For two reasons, this need not detain the inquiry for long.

 First, as to such crimes, subjective good faith is a complete defense. If a defendant believes erroneous advice regarding the legality of the offense conduct, whether the advice comes from the government, from a lawyer, or in a dream, the defendant is not guilty of the crime. There is no need for protection from "the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him," *Raley*, 360 U.S. at 438, 79 S.Ct. at 1266, and there is nothing fundamentally unfair in our system of jurisprudence in letting the jury determine whether the government has proved all the statutory elements of the crime, including an intentional violation of a known legal duty. Simply, the Due Process reliance on misleading government conduct does not apply in the context of crimes requiring proof of an intentional violation of a known legal duty.

 Second, and more to the point, specific intent in the sense of an intentional violation of a known legal duty is not in any way an element of the illegal gambling business offense at issue. To be convicted of participating in an illegal gambling business, a defendant need not be shown to have acted willfully in the sense of intentionally violating a known *federal* legal duty. *United States v. Hawes*, 529 F.2d 472, 481 (5th Cir.1976);

*United States v. Iannelli*, 477 F.2d 999, 1002 (3d Cir.1973), *aff'd on other grounds*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *United States v. Thaggard*, 477 F.2d 626, 632 (5th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973) (erroneous advice of counsel is no defense to Illegal Gambling Business charge); *United States v. Kohne*, 358 F.Supp. 1053, 1060–61 (W.D.Pa.) (Marsh, J.), *aff'd mem.*, 485 F.2d 679 (3d Cir.1973), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2624, 41 L.Ed.2d 224 (1974). The Prohibition of Illegal Gambling Businesses "is the type of statute only requiring a general criminal intent,—a voluntary and intentional doing of an act which the statute makes unlawful—and knowledge that such act is unlawful under federal law is not necessary." *Kohne*, 358 F.Supp. at 1061; *see also* Devitt, Blackmar, & Wolff, 2 *Federal Jury Prac. & Instructions*, § 47.03 (1990); *United States v. Rieger*, 942 F.2d 230, 233–34 (3d Cir.1991).

 Although the *Kohne* court had instructed its jury that the defendants had to know that their conduct was in violation of *state* laws prohibiting gambling, *Kohne*, 358 F.Supp. at 1061 & n. 13, the propriety of such an instruction was not challenged or decided in the court's decision. This Court finds no such willfulness requirement in Section 1955 as applied to the Indictment in this case. The federal statute only requires that the gambling business "is a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955. While the Pennsylvania law alleged to be violated in this case requires "actual intent to use, or actual use of, the video poker machine as a means of gambling," *United States v. Conley*, 833 F.Supp. 1121, 1160 (W.D.Pa.1993) (citing *Commonwealth v. Dumont*, 370 Pa.Super.

---

14. Although in *Levin* the district court framed its conclusion in terms of precluding the government, as a matter of law, from establishing intent, the court of appeals expressly held as follows:

> It is true that, generally, the ... standards [of entrapment by estoppel] involve factual determinations. However, the instant case fails to present that obstacle. From the undisputed operative facts it is apparent that (1) HCFA and its duly designated representatives declared the sales promotion program, which was the predicate for the indictment, to be legal; (2) the appellees relied upon HCFA's announcement; (3) the defendants' reliance was reasonable; and (4) prosecution for violation of the controversial counts of the indictment would be unfair.

*Levin*, 973 F.2d at 468. Notwithstanding the majority's response to the dissent regarding the grounds of the district court order, *Levin* may be construed as case a holding that "entrapment by estoppel" is independent of the intent to commit the crime. *See id.*

155, 169–70, 536 A.2d 342, 349 (1987), *alloc. denied*, 519 Pa. 659, 546 A.2d 620 (1988)), appeal filed on other grounds, (September 29, 1993), there is no requirement that a defendant have the intent to violate a *known* legal duty. Thus, under Section 1955, a defendant need not be shown to have acted willfully in the sense of intentionally violating a known *state* legal duty. *Accord Hawes*, 529 F.2d at 481.

That specific intent in the sense of an intention to violate a known legal duty is not in any way an element of the illegal gambling business offense at issue has two related consequences. First, the Due Process reliance on misleading government conduct defense is available to the Defendants upon appropriate proofs. Second, the Court can determine the defense under Federal Rule of Criminal Procedure 12(b) without trial of the general issue, finding facts as necessary.[15]

Before leaving this procedural issue, the Court notes that its resolution of the issue is supported by Supreme Court and Third Circuit precedent—though not sufficiently to omit the instant analysis in view of the multitude of apparently contrary cases from other circuits. In *Pennsylvania Indus. Chem. Corp.*, the Supreme Court remanded for determination about "whether there was in fact reliance and, if so, whether that reliance was reasonable under the circumstances—*issues that must be decided in the first instance by the trial court*." *Pennsylvania Indus. Chem. Corp.*, 411 U.S. at 675, 93 S.Ct. at 1817

(emphasis added). Unfortunately, it is not clear whether "the decision in the second instance" was meant to be by a jury or an appellate court. *Cf. Raley*, 360 U.S. at 440 n. 15, 79 S.Ct. at 1267 n. 15; *id.* at 443 n. 1, 79 S.Ct. at 1269 n. 1 (Opinion of Clark, J.); and *supra* note 7. The Third Circuit, in *United States v. Gonzales*, 927 F.2d 139, 143–44 (3d Cir.1991), indicated that the closely analogous Due Process defense of "outrageous government conduct" is possibly a defense based on a "defect in the institution of the prosecution" that must be raised before trial and decided by the court. Because of late disclosure of the underlying facts, however, the Third Circuit did not base its opinion on such grounds.

Finally, the nature of the defense itself supports the Court's reserving the determination for itself. The "defense" is founded upon Due Process fundamental fairness. *Brady*, 710 F.Supp. at 295. It is in derogation of the maxim "ignorance of the law is no excuse," *Bruscantini*, 761 F.2d at 642, and should be appropriately limited.

While a jury has a " 'technical right, if it can be called so, to decide against the law and the facts …,' " *United States v. Desmond*, 670 F.2d 414, 416 (3d Cir.1982) (quoting *Horning v. District of Columbia*, 254 U.S. 135, 41 S.Ct. 53, 65 L.Ed. 185 (1920)), such a verdict, unreviewable as it is, remains "illegal." *United States v. Powell*, 469 U.S. 57, 60, 105 S.Ct. 471, 474, 83 L.Ed.2d 461 (1984). Asking a jury to determine the fundamental fairness of convicting a

---

**15.** That specific intent in the sense of an intention to violate a known legal duty is not an element of the illegal gambling business offense has another consequence: Such specific intent is not required to convict under the conspiracy statute, 18 U.S.C. § 371. The Supreme Court has stated:

The general conspiracy statute, 18 U.S.C. § 371, offers no textual support for the proposition that to be guilty of conspiracy a defendant in effect must have known that his conduct violated federal law. The statute makes it unlawful simply to "conspire … to commit any offense against the United States." A natural reading of these words would be that since one can violate a criminal statute simply by engaging in the forbidden conduct, a conspiracy to commit that offense is nothing more than an agreement to engage in the prohibited

conduct. Then where, as here [under 18 U.S.C. § 111], the substantive statute does not require that an assailant know the official status of his victim, there is nothing on the face of the conspiracy statute that would seem to require that those agreeing to the assault have a greater degree of knowledge.

*United States v. Feola*, 420 U.S. 671, 687, 95 S.Ct. 1255, 1265, 43 L.Ed.2d 541 (1975). The Supreme Court therefore held, "[W]here a substantive offense embodies only a requirement of *mens rea* as to each of its elements, the general federal conspiracy statute requires no more." *Id.* at 692, 95 S.Ct. at 1267. *See also United States v. Muncy*, 526 F.2d 1261, 1264 (5th Cir. 1976); *cf. United States v. Gross*, 961 F.2d 1097, 1102–03 (3d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992).

defendant *even if guilt under the law is otherwise established beyond a reasonable doubt* unnecessarily invites such an "illegal" verdict. Moreover, where the issue is submitted to the jury, with proper instructions as to the burden of proof and "elements" of fundamental fairness, the jury is still likely to confuse the government's burden on required intent for conviction with the defendant's burden on reasonable reliance. *Cf. Tallmadge,* 829 F.2d at 781 (Kozinski, J., dissenting) ("I fear the majority's analysis reads scienter into statutes we have consistently held require none"). In short, the Due Process reliance on misleading government conduct, being founded upon the Constitutional notion of fundamental fairness, is an inappropriate issue for a jury to determine and is an appropriate issue for the Court to determine.

### Standard of Review

 The Government contends that because the Court is reviewing a motion to dismiss the Indictment, it is entitled to have all the record evidence viewed in the light most favorable to it. The Defendants are requesting that the record be reopened so that their proffered evidence may be introduced in a hearing.

Because the Court is addressing a 12(b) motion to dismiss an indictment, the Court must assume that the pertinent allegations of the Indictment are true. *See Serfass v. United States,* 420 U.S. 377, 391–92, 95 S.Ct. 1055, 1064–65, 43 L.Ed.2d 265 (1975); *Gulf Oil Corp.,* 408 F.Supp. at 459. For present purposes, therefore, the Court assumes that, in violation of 18 U.S.C. §§ 371, 1955 and 2, the Defendants conspired to participate and in fact participated in the alleged illegal gambling business, using video poker machines for gambling purposes in violation of 18 Pa. Cons.Stat.Ann. § 5513.

At this stage, the Court is addressing the motions to dismiss primarily on the basis of the Defendants' proffered evidence. Not having admitted all Defendants' evidence in a full hearing on the motions, the Court is not in a position to make findings of fact or credibility determinations to resolve factual disputes. *Cf.* Fed.R.Crim.P. 12(e). The Court cut short Defendants' presentation of their evidence on the basis that it was insufficient as a matter of law and hence irrelevant. Defendants' proffer of evidence, which does not contradict the allegations of the Indictment, is therefore entitled to be viewed in the light most favorable to the Defendants. *Brebner,* 951 F.2d at 1024 ("A district court's determination [based on proffered evidence] that there exists no evidence sufficient to raise a valid defense is analogous to a determination that a jury instruction relating to a defendant's theory of the case is not warranted by the evidence"); *cf. Billue,* 994 F.2d at 1568 ("The trial court has authority to refuse to instruct the jury on a defense where the evidence used to support it, if believed, fails to establish a legally cognizable defense"); *Smith,* 940 F.2d at 715 n. 4 (defendant's evidence, excluded in jury trial, to be viewed in light most favorable to defendant); *Hedges,* 912 F.2d at 1406 (evidence purporting to justify defendant's jury instruction to be viewed in favor of defendant).

Because the Due Process reliance on misleading government conduct defense is to be determined under the totality of the circumstances, *Pennsylvania Indus. Chem. Corp.,* 411 U.S. at 674–75, 93 S.Ct. at 1816–17; *Smith,* 940 F.2d at 714; the Court will also rely on the record as a whole, to the extent that it reflects undisputed facts, in addition to Defendants' proffer.

### The Merits

 It is undisputed that the Defendants have pointed to no federal government conduct in support of their Due Process defense. The Government asks that the Court apply a *per se* rule to deny the defense and hold that the federal government cannot be estopped from enforcing its criminal laws by the conduct of state or local officials. The Court declines to adopt such a *per se* rule.

 The Government can point to numerous authorities holding or urging that the Due Process defense can be invoked only in reliance upon *federal* government conduct. *See Clark,* 986 F.2d at 69; *Hurst,* 951 F.2d at 1499–1500; *Brebner,* 951 F.2d at 1026–27; *Etheridge,* 932 F.2d at 320–21; *Austin,* 915 F.2d at 366; *Tallmadge,* 829 F.2d at 776–78 (Kozinski, J., dissenting); *Bruscantini,* 761

F.2d at 641–42. The focus of the Due Process inquiry into fundamental fairness and substantial justice, however, should not be arbitrarily constrained by concepts taken from other contexts such as estoppel, actual authority or deterrence.[16] *Brady*, 710 F.Supp. at 296 ("The better view is that the defense is not based on the government being bound by the conduct of its agents, but rather, the fundamental unfairness of punishing a defendant for conforming his conduct to an erroneous interpretation of the law [rendered by an apparently authoritative government official] ..."); *see also Hedges*, 912 F.2d at 1405 ("There has never been a suggestion that Lehman could waive or authorize a violation of the statute. On the contrary, the only issue before us, clearly, is whether Hedges acted on advice that he was not violating the statute"). A *per se* rule in a federal criminal prosecution predicating the availability of the Due Process defense on *federal* action saps the notion of fundamental fairness of its flexibility and leaves the door open for fundamentally unfair prosecutions to be upheld.

An illegal gambling business prosecution illustrates the potential fundamental unfairness inherent in such a *per se* rule. The case of *United States v. Hurst*, 951 F.2d 1490 (6th Cir.1991) is instructive. In *Hurst*, the defendants sought a jury instruction on "entrapment by estoppel" in an illegal gambling business prosecution on the basis of statements made by state officials regarding state gambling laws. On two grounds, the court affirmed the failure to instruct in the circumstances presented.

First, the court found no evidence to support the instruction. One state official was part of the illegal gambling business and instructed its members on how to flout the law, not comply with it. Another official stated that documentation—apparently valid on its face, but containing misrepresentations of facts—was acceptable. Finally, there was lax enforcement of certain regulations, but no assurances that the illegal gambling business was in compliance with the regulations. *Id.* at 1499.

■ Second, the court relied on the fact that the alleged advice had been rendered by state officials regarding state law. The court stated as follows:

Moreover, the statements allegedly relied upon were made by state officials relating to state law, while the defendants were charged with violations of federal law. One of the purposes of section 1955 was to aid in the enforcement of state gambling laws where state enforcement was disabled by corruption of state officials.... Allowing a state official's alleged complicity in illegal activities to void the convictions here would violate the intent of Congress in enacting section 1955 and distort the clear due process doctrine set forth in Cox and Raley.

*Id.* at 1499–1500 (citation omitted). Notwithstanding Congressional intent in passing Section 1955, this Court holds that the Due Process clause may still invalidate certain prosecutions under Section 1955 solely on the basis of reliance upon advice from state or local officials.

■ One element of a Section 1955 violation is that the business operate in violation of state or local law. In the circumstances of the present Indictment, the business must violate the Pennsylvania prohibition against knowingly maintaining devices intended for gambling. As explained above, the intent required under Pennsylvania law leaves open the possibility of application of the Due Process defense. If a defendant who intended to maintain gambling devices relied on advice from an appropriate state or local official that the conduct was legal, without complicity or corruption on the part of the government official, the Due Process clause would render a state prosecution a nullity. The Court fails to see how a prosecution founded on the same conduct and the same state law would

---

16. *Bruscantini* relies in part on a deterrence rationale to limit the availability of the Due Process defense. 761 F.2d at 641–42. This Court finds the rationale inapposite. The Supreme Court, in the Due Process cases, has evinced no desire to control the out-of-court rendering of legal advice by government officials. Rather, addressing each prosecution before it, the Supreme Court held that once erroneous advice has been given, the imposition of criminal sanctions for following the advice violates Due Process and the prosecution is a nullity.

be rendered fundamentally fair because it was instituted by federal authorities. The Court therefore rejects the Government's proposed *per se* rule.

■ Nonetheless, turning to the totality of the circumstances reflected in the Defendants' proffer and undisputed record facts and granting the defendants all reasonable inferences from their proffered evidence, the court concludes that the prosecution of these defendants does not run afoul of traditional notions of fundamental fairness. The Court now turns to the substance of this inquiry, examining in turn the evidence proffered relative to the conduct of Pennsylvania officials and local government officials.

Defendants' proffer must be viewed in the light of Pennsylvania law during the time covered by the Indictment, which is 1984 through September 1991. The Pennsylvania gambling and gambling devices statute, 18 Pa.Cons.Stat.Ann. § 5513, was in effect throughout the period.[17] The statute criminalized, among other things, maintenance or use of *per se* illegal poker machines, as defined in case-law, *Commonwealth v. Two Elec. Poker Game Mach.*, 502 Pa. 186, 465 A.2d 973, 975–79 (1983) (Electo–Sport), and use of *any* video poker machine for gambling purposes. *Id.* 465 A.2d at 979–80 (Two Poker Games); *Commonwealth v. Forry*, 201 Pa.Super. 431, 193 A.2d 761 (1963); *see also Commonwealth v. Twelve Dodge City Video Poker Mach.*, 517 Pa. 363, 365–67, 537 A.2d 812, 813–14 (1988); *Commonwealth v. Du-*

*mont*, 370 Pa.Super. 155, 169–70, 536 A.2d 342, 349 (1987), *alloc. denied*, 519 Pa. 659, 546 A.2d 620 (1988).

Defendants have proffered evidence of the enforcement policies regarding video poker machines of Pennsylvania law enforcement authorities generally, the specific policies of the Pennsylvania Liquor Control Board, the State Police Bureau of Liquor Control Enforcement, and the Vice and Intelligence Squad of the Pennsylvania State Police. In addition, the Defendants proffer the prior testimony of Pennsylvania Attorney General Ernest D. Preate, Jr. at a May 24, 1990 hearing before the Pennsylvania House of Representatives Finance Committee. None of this evidence suffices to demonstrate that the conduct [18] of Pennsylvania officials raised any ambiguity as to the legality of gambling conducted through the use of illegal poker machines.

■ A court must defer to a decision to prosecute a defendant, absent certain limited classes of abuses of prosecutorial discretion. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978).[19] The exercise of prosecutorial discretion in a world of limited resources may entail choosing upon which crimes to focus. A choice at a point in time or by a particular administration to focus on certain crimes is also a choice to make the enforcement of the crimes not chosen a lesser priority.

---

**17.** The statute states in relevant part:

§ 5513. Gambling devices, gambling, etc.

(a) Offense defined.—A person is guilty of a misdemeanor of the first degree if he:

(1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards;

(2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;

(3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or

(4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.

**18.** The Court takes a broader view of "conduct" than the Government does in this case. As *Pennsylvania Indus. Chem. Corp.* demonstrates, written administrative interpretations of a law that are published, but not specifically directed to the defendant, may still support a Due Process misleading government conduct defense. 411 U.S. at 672–74, 93 S.Ct. at 1815–16.

**19.** The *Bordenkircher* Court stated:

In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion. *Bordenkircher*, 434 U.S. at 364, 98 S.Ct. at 668; *see also United States v. Goodwin*, 457 U.S. 368, 380 n. 11, 102 S.Ct. 2485, 2492 n. 11, 73 L.Ed.2d 74 (1982).

Assuming that Pennsylvania law enforcement authorities tolerate the use of video poker machines for gambling purposes, the Court holds that such toleration does not in fact legalize otherwise illegal conduct. Such toleration is not a valid ground upon which to base a claim of having been misled by the government and reliance on lax enforcement is not reasonable in view of the clear state of Pennsylvania law throughout the relevant period prohibiting gambling with video poker machines. "If this court were to accept ... [the Defendants'] contention that mere nonfeasance in law enforcement was tantamount to official approval of illegal acts and entrapment, there would be scarcely a speeding ticket not subject to due process challenge." *Hurst,* 951 F.2d at 1499.

The proffer of Defendant Goodwin relative to the enforcement policies of various Pennsylvania state authorities is therefore irrelevant. First, the proffer indicates that citations were issued and seizures of the machines did in fact occur, when the state authorities had evidence of gambling activity. Second, Defendant Goodwin cannot rely upon the authorities' failure to seize all poker machines merely upon sight because, under Pennsylvania law, not all video poker machines are illegal *per se,* the characteristics making a machine illegal *per se* are not apparent upon visual inspection of the outside of the machine, and seizures and searches of video poker machines are constrained by the constitutions of Pennsylvania and the United States. *United States v. Conley,* 856 F.Supp. 1010, 1014–1022 (W.D.Pa.1994) (Document No. 801).

The transcript of the testimony of Pennsylvania Attorney General Preate is no more availing. To be clear, Defendants have not proffered that the Attorney General would testify in the present proceedings. They merely proffer that he previously testified (late in the indictable period) that upon assuming office, poker machine gambling was "so widespread, and *enforcement efforts* were so *intermittent* and the resulting *sanctions* so *minor* that the situation was tantamount to the de facto legalization of video poker gambling." Exhibit 21–Y at 3 (emphasis added). It appears in the Defendants' own proffer that the conduct was illegal, the law *was* enforced and sanctions *were* imposed. Moreover, Exhibit 21–Y in its entirety undercuts the reasonableness of relying on these statements. Exhibit 21–Y details the enforcement efforts undertaken *after* the Attorney General took office. More damning still is the fact that nowhere in Exhibit 21–Y is it stated that video poker machine gambling is legal in Pennsylvania, and the statement was submitted in hearings, prompted by the efforts of PAVO, called to discuss the subject of legalizing video poker gambling! Defendants' proffer relative to the prior testimony of Attorney General Preate is irrelevant.

Moreover, it is undisputed that Defendants were raided by the State Police on September 23, 1988, November 9, 1988 and January 27, 1989. Clearly, after that Defendants were on notice that the Pennsylvania authorities considered their activities unlawful.

Defendants have proffered no evidence supporting their Due Process reliance defense with respect to the conduct of Pennsylvania state authorities.

The Court now turns to the conduct of local authorities. The Defendants have proffered evidence regarding the issuance of permits and licenses to video poker machine operators, the fees charged therefore and the knowledge of those issuing the licenses. Viewing the proffered evidence and the inferences therefrom in the light most favorable to the Defendants, the proffered evidence establishes the following scenario.

Both video poker machines and video poker gambling are widespread in the Western District of Pennsylvania. Most local governments have ordinances requiring either a license or a permit to operate a video poker machine. While some local governments license video poker machines under the general rubric of video amusement devices, others license video poker machines as such. Most of the ordinances pursuant to which the licenses were issued state that no licenses will be issued for illegal gambling devices or devices declared illegal by a court of competent jurisdiction. Hundreds, if not thousands, of persons have received the applicable permits

from local governments to operate video poker machines. The local governments charge fees for the issuance of permits. The fees charged for video poker machine licenses rose each year because the local government officials knew the amount of money being generated by video poker machine gambling. Some of the Defendants paid the fees and received video poker machine license in return.

There is testimony in this record by police officials, including City of Pittsburgh Detective John Bosetti that pay-offs are made on *all* video poker machines. Defendant Ferrell proffered testimony that certain local governments had public meetings during which the legal status of video poker machines was discussed, and the local governments continued to license video poker machines. Defendant Ferrell has also proffered that in 1993 his investigator had sought licenses for video poker machines from various local governments and had been furnished information on how to obtain such licenses. Defendant Ferrell, however, conceded that the investigator had not indicated either that the machines in question were *per se* illegal machines or that the machines would be used for gambling purposes. Nevertheless, Defendant Duffy Conley has proffered the testimony of unnamed local government officials from, without limitation, McKees Rocks Borough, Robinson Township, Kennedy Township and Brentwood Borough. Their testimony would be that they and other governmental officials were aware of their municipalities' issuing video poker permits for machines on which pay-offs were being made. Moreover, due to the amounts of money being generated by illegal poker gambling, the local governments raised the licensing fees in order to capture a larger portion of the money. No local government official is now being or has been prosecuted under 18 U.S.C. § 1955 or 18 U.S.C. § 1956.

■■■■ Defendants cannot rely upon the municipal ordinances pursuant to which the licenses were issued. In contrast with the regulations in *Pennsylvania Indus. Chem. Corp.*, it appears in Defendants' proffers that the ordinances were written so as to *not* authorize licenses for the conduct criminalized by the governing statute.

While Defendants' proffers allege a disconcerting state of affairs regarding local governments' relationships with illegal video poker gambling in the Western District of Pennsylvania, the Court is not persuaded that the Defendants' being prosecuted is fundamentally unfair within the meaning of the Due Process clause. The local government conduct alleged can be interpreted two ways, and neither interpretation is beneficial to the Defendants.

First, the local government conduct can be given a sinister interpretation. Under this interpretation, local government officials condoned, allowed, and literally placed their stamps of approval on conduct they knew to be illegal in exchange for licensing fees. But as the *Hurst* court said, "Allowing a state official's alleged complicity in illegal activities to void the convictions here would violate the intent of Congress in enacting section 1955 and distort the clear due process doctrine set forth in *Cox* and *Raley*." *Hurst*, 951 at 1499–1500. Moreover, corruption of government officials—federal, state or local—certainly does not raise Due Process concerns about prosecuting any of the parties involved.

Second, the local government officials, notwithstanding their alleged knowledge of the intended use of the machines, may have issued licenses relying upon the clear Pennsylvania law indicating that not all machines are *per se* illegal and relying on other agencies to ensure compliance with the Pennsylvania gaming statute. This scenario reflects a mere laxity in enforcement, which, in view of prosecutorial discretion, cannot invalidate an otherwise valid prohibition. *Id.* at 1499.

The Court has assumed that video poker machines are used *only* for illegal gambling in part on the basis of the testimony in this record by law enforcement personnel such as Detective Bosetti. Such testimony, in context, is not an endorsement of illegal poker machine gambling. For instance, the record reflects that Detective Bosetti was instrumental in securing a conviction against Defendant Duffy Conley in March of 1988 for previously occurring conduct. Moreover, while there is no evidence of the enforcement

efforts undertaken in each locality, the record clearly reflects that the City of Pittsburgh Police raided the Defendants on September 23, 1988, and December 16, 1988. However much reliance Defendants placed upon the City of Pittsburgh licenses as authorizing their gambling activities to that point, such reliance would clearly be unreasonable thereafter.

■ The conduct of local government officials may have created a certain ambiguity in the form of mixed signals to the Defendants. Defendants, however, are charged with conducting an illegal gambling business in violation of state law, not in violation of the local ordinances. Reliance upon the ambiguous conduct of local officials in enforcing an otherwise clear statute of state-wide application is not reasonable. The ordinances adopted by the local governments did not purport to alter state law, and the Defendants have proffered no evidence indicating that the local governments ever claimed the authority to interpret the state statute.

No government official at any level ever expressly reassured the Defendants that their conduct in the ambiguous local milieu was in fact legal. The Defendants' proffer may support an inference that, in the years before 1988, they believed they would not be prosecuted for their gambling activities. Nonetheless, the proffer and record is devoid of evidence of that the Defendants actually believed their gambling activities were in fact legal activities under Pennsylvania law, and their lobbying activities point strongly to the opposite conclusion.

■ Under the totality of the circumstances, the Defendants have not been misled by government officials into believing that their illegal gambling activities were in fact legal under Federal law or Pennsylvania law, and Defendants have failed to persuade the Court that the federal prosecution of them under Section 1955 is fundamentally unfair.

The Court will deny *with prejudice* Defendants' "Motion to Dismiss on the Grounds That Video Poker Machines Are De Facto Legal in Pennsylvania." Further, upon timely objection, the Court will exclude evidence relevant *solely* to such a theory of defense.

## SELECTIVE PROSECUTION

Defendants frame this issue as follows:

Does an unconstitutional selective prosecution occur when there are hundreds of persons using video poker machines as illegal gambling devices in Pennsylvania and the federal government prosecutes only those who spoke in favor of, and petitioned the general assembly for, legislation establishing the legality of such devices.

Brief of Defendant John F. "Duffy" Conley in support of Motion to Dismiss on Ground of Selective Prosecution, at 1–2 (Document No. 750). Defendants' primary contention is that they are being prosecuted because of their exercise of First Amendment rights. Defendants have also indicated that local government officials who allegedly opened their borders to the Defendants' activities in exchange for high and increasing licensing fees have not been targeted for prosecution as they have. The Government argues that the Defendants have not made a substantial showing of selective prosecution on any grounds.

## PROCEDURE AND STANDARD OF REVIEW

■ The first issue is again whether the issue of selective prosecution is "determinable without the trial of the general issue," Fed.R.Crim.P. 12(b), and the Court is to decide the issue, finding facts as necessary. The cases clearly indicate that the issue is to be so determined. *Compare Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (Supreme Court affirms Ninth Circuit's reversal of District Court's acquittal based upon finding of selective prosecution); *with Serfass v. United States*, 420 U.S. 377, 391–92, 95 S.Ct. 1055, 1064–65, 43 L.Ed.2d 265 (1975) (orders granting acquittal are appealable notwithstanding the Double Jeopardy clause, if the issue was determinable without trial of the general issue); *see also United States v. Schoolcraft*, 879 F.2d 64, 67 (3d Cir.) ("In both vindictive and selective prosecution claims, we review the *district court's determinations of fact* under a clearly erroneous standard. . . . The district court's application of legal precepts

in these claims are given plenary review") (emphasis added; citations omitted), *cert. denied,* 493 U.S. 995, 110 S.Ct. 546, 107 L.Ed.2d 543 (1989).

The second issue relates to the standard of review to be employed by this Court, where the Court is determining whether the Defendants are entitled to a hearing on selective prosecution. Although the Court reaches the same conclusion in this instance as it reached with respect to Defendants' Due Process challenge to their prosecution, the law regarding district court procedures is better developed in the context of selective prosecutions.

■ Although Defendants' Due Process claim implicated the issue of prosecutorial discretion, it did not directly challenge the Government's exercise of its prosecutorial discretion like the present claim does. Courts have developed certain procedural rules to protect such discretion from routine challenge in every prosecution, while preserving a defendant's right not to be subjected to discriminatory prosecutions. *United States v. Torquato,* 602 F.2d 564, 569 (3d Cir.), *cert. denied,* 444 U.S. 941, 100 S.Ct. 295, 62 L.Ed.2d 307 (1979). Within the Third Circuit, the procedure is as follows:

> In order to minimize the intrusion on the prosecutorial function and still enable a defendant effectively to raise a claim of selective prosecution, the defendant is obligated to make a threshold showing of discriminatory prosecution before an evidentiary hearing will be accorded on this issue.... The defendant bears the burden of proving a "colorable entitlement," ... to the claim of selective prosecution. Some credible evidence must be adduced indicating that the government intentionally and purposefully discriminated against the defendant by failing to prosecute other similarly situated persons.

*Id.* at 569–70 (citations omitted). Nonetheless, because the Court is proceeding to determine the Defendants' entitlement to a full hearing on the selective prosecution issue— an issue determinable without the trial of the general issue—the court will employ the same standard of review with respect to this claim as it did with respect to the Due Process claim. The Court assumes that the allegations of the Indictment are true and gives the Defendants the benefit of the reasonable inferences from their proffered evidence.

## THE MERITS

■ The question before the Court is whether the Defendants have proffered some credible evidence "indicating that the government *intentionally and purposefully discriminated* against the defendant[s] by failing to prosecute other similarly situated persons." *Torquato,* 602 F.2d at 570 (emphasis added). The Court of Appeals for the Third Circuit has adopted the following formulation of "intentional and purposeful discrimination:"

> "To support a defense of selective or disciminatory (sic) prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, *i.e.,* based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. These two essential elements are sometimes referred to as 'intentional and purposeful discrimination.' "

*Id.* at 569 n. 8 (quoting *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974)). In a federal prosecution, the Defendants must show that the federal prosecutor has purposefully and intentionally discriminated. *Schoolcraft,* 879 F.2d at 68. The Court concludes that Defendants have not made a sufficient showing of selective prosecution so as to warrant a hearing on the matter.

■ The Defendants have not shown that they have been prosecuted where others similarly situated have not been. The Indictment charges the Defendants with operating a large scale illegal gambling business involving in excess of twenty-three persons in violation of federal law. While they have cited

the number of video poker machines licensed to others within the Western District, the have not proffered any evidence indicating that other large scale illegal gambling businesses are operating in the jurisdiction in violation of federal law. While the Defendants point to the Indictment in *United States v. Varney*, Crim. No. 92–145 (W.D.Pa.) to support their claim that the exercise of First Amendment rights through PAVO is the Government's criteria for prosecution, that indictment undercuts their attempt to show others similarly situated are not being prosecuted. The only similarly situated persons the Defendants have pointed to are in fact being prosecuted.

■ As to all the other license holders, who the Court will assume are using the video poker machines in violation of Pennsylvania law, the Defendants have offered no proof that they operate illegal gambling businesses as defined in the federal statute, or that they have reached the size and sophistication of the Duffy Conley organization described in the Indictment. The focus of the selective prosecution inquiry is on the federal prosecutor. Defendants have not proffered evidence of any organization that falls within the federal prosecutor's jurisdiction as delimited in Section 1955 and is not being prosecuted.

Assuming *arguendo* that the relevant similarity between the Duffy Conley organization and the Varney organization is their lobbying activity, rather than their size and sophistication, the Defendants charged in the present Indictment—the Duffy Conley organization—have failed to show "that the government's discriminatory selection of them for prosecution was invidious or done in bad faith—i.e., that the government selected its course of prosecution 'because of,' rather than 'in spite of,' its adverse effect upon an identifiable group." *United States v. Sparks*, 2 F.3d 574, 580 (5th Cir.1993) (quoting *Wayte*, 470 U.S. at 610, 105 S.Ct. at 1532), *cert. denied,* ⸺ U.S. ⸺, 114 S.Ct. 720, 126 L.Ed.2d 684 (1994). For present purposes, it is established by the Indictment that the Duffy Conley organization conducted a large scale illegal gambling business from 1984 through most of 1991. The Defendants' prof-

fered evidence indicates that the Government investigated the Defendants' activities from 1986 through the date of the Indictment. For about two years the Government investigated possible tax violations. In 1988 and 1989, the Government's focus shifted to violations of Sections 1955 and 1956. *Only in the summer of 1989 did the Defendants enter into political activities.*

■ At some point, presumably shortly before the formation of PAVO, Duffy Conley and his associates became concerned about the illegality of their business. Duffy Conley phrases it as follows:

When the federal government, with its infinite manpower and resources, entered the scene, "Duffy" Conley was confronted with three choices: (1) fold up his tent and proceed to a state, such as Nevada, where gambling activities are legal; (2) continue to operate in Pennsylvania in a secretive manner so as to avoid the attention of federal agents; or (3) muster funds and resources and embark on a campaign to secure legislation legalizing video poker machines as gambling devices. "Duffy" Conley opted for the latter, since this course had proven fruitful in the case of bingo and small games of chance.

Brief of Defendant John F. "Duffy" Conley in Support of Motion to Dismiss on Ground of Selective Prosecution, at 3. Perhaps disastrously, Duffy Conley failed to recognize that the lobbying course he in fact pursued could be undertaken in two ways. First, he could refrain from engaging in the illegal conduct that motivated the federal investigation in the first instance, or second, he could continue his illegal course of conduct while trying to change its status under the law. According to the Indictment, Duffy Conley chose the latter means of lobbying.

First Amendment rights are not a means of immunizing one-self from prosecution. Convictions would be few indeed if during or after a course of crime a defendant could absolve himself by expressing his view that his conduct should be legal.

Before the Defendants first engaged in protected lobbying activity, the Government had invested around three years in investi-

gating their illegal gambling business. The Government's failure to cease in its efforts to bring the continuing illegal gambling business to justice in the face of an ultimately failed attempt by the members of the business to conform law to their ongoing activities is no evidence that the Defendants were prosecuted because of their lobbying efforts rather than in spite of them.[20]

■ The Defendants have not pressed the argument with respect to the local government officials who allegedly abetted the activities of the illegal gambling business but have not been subject to prosecution under Section 1955 and 1956. The Court does not view them as similarly situated. While the local government officials' conduct may violate 18 U.S.C. § 2, 1955 and/or 1956, the officials are dissimilarly situated from an evidentiary standpoint. The Government would have to connect the officials' conduct with their subjective intent. Their conduct is once removed from the Defendants' activities, and it would be more difficult to infer a bad intent from the nature of the officials' acts than it is from the alleged activities of the Defendants. Moreover, other than the alleged motivation of suppressing the Defendants' First Amendment rights, the Defendants have proffered no evidence of invidious or bad faith prosecution.

The Court will deny with prejudice the motion to dismiss on the ground of selective prosecution.

## MOTIONS TO ASSERT AFFIRMATIVE DEFENSES

Defendant Ferrell and Defendant Jack Conley have filed motions seeking leave to assert affirmative defenses. Jack Conley's motion is twofold, seeking to contest at trial the Government's case with respect to the requisite elements of intent in the crimes for which he is charged and seeking to introduce evidence before the jury regarding the Due Process reliance on misleading government conduct defense. Defendant Ferrell's motion seeks leave to present evidence to the jury in the event that the Court denies his four motions to dismiss the indictment. As noted above, Defendant Ferrell's motions to dismiss have been pursued as raising only two issues: the Due Process reliance on misleading government conduct defense and the selective prosecution defense. Defendant Duffy Conley's briefs in support of Defendant Ferrell's Due Process motion to dismiss also raise the issue of his ability to prove that he lacked the intent required under the criminal statutes. For instance, the Brief of Defendant John F. "Duffy" Conley in Support of Motion to Dismiss on Grounds that his Conduct Was De Facto Legal, a De Minimus Infraction and a Lawful Exercise of Public Authority states, "Pennsylvania's general climate with respect to video poker machines . . . supports a finding that 'Duffy' Conley lacked criminal intent." *Id.* at 5.

Under Federal Rule of Criminal Procedure 12(b) an issue is determinable without trial on the merits or it is not; there is no middle ground. The Court has determined that both the Due Process and the selective prosecution defenses are appropriate for pretrial disposition by the Court. With respect to those issues, the Court will deny with prejudice the Defendants' motions to present such defenses to the jury.

The only remaining question is whether the Defendants will be allowed to contest the Government's presentation before the jury on the element of intent. This is not a hard question.

■ The Court is neither empowered nor inclined to deny Defendants their constitutional right to contest the truth of the Government's allegations before a jury. In its

---

**20.** Defendant Duffy Conley relies on his statement at the Main Hotel on October 30, 1989 in support of his selective prosecution motion. Whether viewed as protected speech or as evidence of invidious intent, that statement can be of no avail to Duffy Conley. After ruling that Duffy Conley's statements should be suppressed as involuntary, Duffy Conley was afforded a hearing during which he was allowed to explore the statement's effect on the decision to prosecute. In a previous opinion, the Court found that Duffy Conley's suppressed statement had no influence on the decision to target him for prosecution. *United States v. Conley*, Crim. No. 91–178, slip op. at 11–12, —— F.Supp. ——, —— —— —— (W.D.Pa. June 30, 1994) (Document No. 921).

discretion, the Court will instruct the jury on the intent elements that the Government must prove beyond a reasonable doubt, and will entertain requests from the Defendants on appropriate jury instructions. *See United States v. Gross,* 961 F.2d 1097, 1101–03 (3d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992). This aspect of the Defendants' motions will be denied *without prejudice* to the Defendants' right to adduce evidence at trial and seek *appropriate* jury instructions.

An appropriate order will be entered.